[No. B120616. Second Dist., Div. Five. Feb. 9, 2000.]

THE VONS COMPANIES, INC., Plaintiff and Respondent, v.
UNITED STATES FIRE INSURANCE COMPANY, Defendant and
Appellant.

54

COUNSEL

Law Offices of Arthur Paul Berg and Arthur Paul Berg for Defendant and Appellant.

Gilbert, Kelly, Crowley & Jennett and Peter J. Godfrey for Plaintiff and Respondent.

## OPINION

**GODOY PEREZ, J.**—Defendant United States Fire Insurance Company appeals from the judgment entered in a declaratory relief action ordering it to indemnify its insured, plaintiff The Vons Companies, Inc. For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY[1]

On April 20, 1992, Danny McKernan was seriously injured after he was struck by a pallet jack being operated by an employee of plaintiff and respondent The Vons Companies, Inc. (Vons). The accident occurred outside a Vons store in the common area of a shopping center owned by Vons's landlord, Longs Drug Stores (Longs). McKernan sued Vons (the McKernan complaint), which in turn cross-complained against Longs, alleging that Longs had expressly agreed to indemnify Vons for injuries occurring in the common area and that Longs was partially to blame for the accident. Vons also cross-complained against an entity known as Carrick & Associates (Carrick), which managed the shopping center property, and another entity known as Astin, Carr & Associates (Astin, Carr).

As part of Vons's lease agreement with Longs, Vons was named as an additional insured under Longs's comprehensive general liability (CGL) policy (the Longs policy) issued by National Union Fire Insurance Co. (National Union). The Longs policy provided $1 million in coverage, subject to a self-insured retention (SIR) endorsement in the sum of $500,000 per occurrence or an aggregate total of $3.2 million during the policy period. It is undisputed that the Longs policy SIR was exhausted at the time of the McKernan complaint, so that the Longs policy provided "first dollar coverage" for McKernan's injuries.

Vons was also insured under its own CGL policy (the Vons policy) issued by defendant and appellant United States Fire Insurance Co. (USF). The Vons policy provided $1 million in coverage for the McKernan action, but included an SIR endorsement of $1 million before USF's obligations were triggered. The SIR endorsement in the Vons policy said USF's duties were "limited to payment of that portion of the ultimate net loss resulting from any one occurrence or offense which is in excess of the self insured retention of $1,000,000." (Original underscoring.) The SIR endorsement defined "ultimate net loss" to mean "the total of the following sums with respect to each

---

[1]The appeal in this insurance coverage declaratory relief action arises from a bench trial held on mostly undisputed facts after the parties submitted trial briefs and certain documentary evidence.

occurrence or offense: [¶] a. All sums which the insured is legally obligated to pay as damages, whether by reason of adjudication or settlement because of liability to which this insurance applies, and: [¶] b. All expenses incurred by the insured in the investigation, negotiation, settlement or defense of claim or suits seeking such damages, excluding only the salaries of the insured's regular employees, provided 'ultimate net loss' shall not include any damages or expenses because of liability excluded by this policy."

Finally, and most relevant to our inquiry, the SIR endorsement in the Vons policy provided that it was "[s]ubject to the limits of liability, exclusions, conditions and other terms of the policy to which this agreement is attached . . ." and that "[a]ll other terms and conditions of this Policy remain unchanged."

In July 1996 a settlement of the McKernan complaint was reached (the McKernan settlement). The parties to the McKernan settlement were Vons, Longs, Carrick and Astin, Carr, which were designated as "the defendants," and National Union, which was designated as the "insurer." McKernan agreed to a general release as to the defendants and to dismiss his complaint against Vons in exchange for a cash payment of $828,715 and the purchase of a $711,190 annuity which would provide him $4,000 a month over the next 20 years, bringing the total settlement cost to $1,539,905.

No allocation of the settlement funds was made in the McKernan settlement and its monetary terms were to be confidential. Instead, it required National Union and/or the defendants as a group to pay the settlement proceeds. The McKernan settlement made no provision for a resolution or dismissal of Vons's cross-complaint against Longs. National Union then issued a $1 million check to Vons, which contributed $539,905 of its own funds and paid all the funds owed under the McKernan settlement.

Before the McKernan settlement was reached, a dispute arose between Vons and USF as to whether the $1 million SIR in the Vons policy would be deemed exhausted if that sum were paid on behalf of Vons as an additional insured under the Longs policy. USF took the position that the Vons policy SIR endorsement required Vons to pay $1 million of its own money, not money coming from other insurance, before the SIR was exhausted and USF's obligations were triggered. As a result of this dispute, Vons sued USF in December 1995 for declaratory relief, contending that USF's obligations would be triggered if National Union funded the first $1 million of any settlement with McKernan.

After the McKernan settlement was reached, when USF still refused to reimburse Vons the $539,905 which Vons had paid, the matter went to a

one-day bench trial on November 17, 1997, based on the oral argument, briefs and exhibits of the parties. On December 3, 1997, the court issued a statement of decision which found that USF was required to reimburse Vons the $539,905 that Vons contributed to the McKernan settlement. The court made the following findings: (1) the Vons policy was the result of negotiations between well-informed, fully advised parties in equal bargaining positions; (2) the policy provided primary coverage and was not intended to be excess coverage over other insurance; (3) under the Vons policy, USF was to pay Vons's ultimate net loss greater than $1 million for any covered occurrence; (4) "ultimate net loss" was defined as all sums which Vons was legally obligated to pay by way of settlement; (5) the McKernan settlement did not allocate the payment of settlement funds between the parties and both Vons and Longs were legally obligated to pay the entire amount; (6) the Vons policy did not limit the source of the $1 million SIR in any way and did not require Vons to pay the SIR only from its own pocket; (7) had the parties intended that the SIR could be satisfied only when Vons, and not some other source, paid the $1 million SIR, the policy would have said so; (8) because National Union paid the first $1 million of the McKernan settlement to its additional insured on the Longs policy, with Vons then paying the full $1,539,905 of the settlement funds, the SIR under the Vons policy had been exhausted and USF was obligated to make up the difference; and (9) because USF was invited, but declined, to take part in the McKernan action and settlement negotiations, it was in no position to object to the results of that settlement.

USF objected to the statement of decision, asking that the court discuss evidence relative to the allocation issue which showed that McKernan had viable claims against Longs, that Vons had a claim against Longs under an express indemnification agreement, and that Vons failed to introduce any evidence to show how much, if any, of the $1 million from National Union was attributable to Vons. In a supplemental objection, USF took issue with the court's characterization of the Vons policy as providing primary coverage and the Longs policy as umbrella coverage, since both were in fact the same—by their terms excess to the insured's SIR. On February 9, 1998, the court overruled USF's objections and entered judgment for Vons. This appeal followed.

## STANDARD OF REVIEW

The interpretation of an insurance policy is a question of law subject to our independent review. (*Bluehawk v. Continental Ins. Co.* (1996) 50

Cal.App.4th 1126, 1131 [58 Cal.Rptr.2d 147].) To the extent the facts below were undisputed and capable of only one reasonable inference, we will independently review them as well to determine their legal effect. (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 776 [9 Cal.Rptr.2d 120].)

DISCUSSION

## 1. *Insurance Contract Interpretation Rules*

██ While insurance contracts have special features, they are still contracts subject to the ordinary rules of contract interpretation. The fundamental goal of contract interpretation is to give effect to the parties' mutual intentions, which, if possible, should be inferred solely from the written terms of the policy. If that language is clear and explicit, it governs. (*General Star Indemnity Co. v. Superior Court* (1996) 47 Cal.App.4th 1586, 1592 [55 Cal.Rptr.2d 322], hereafter *General Star*.) Policies must be interpreted as a whole, giving force and effect to every provision where possible. (*City of Oxnard v. Twin City Fire Ins. Co.* (1995) 37 Cal.App.4th 1072, 1079 [44 Cal.Rptr.2d 177], hereafter *City of Oxnard*.)

██ Policy provisions are ambiguous only if they are capable of two or more reasonable constructions. We will not adopt a strained or absurd interpretation to create an ambiguity where none exists. The policy terms must be construed in the context of the whole policy and the circumstances of the case and cannot be deemed ambiguous in the abstract. (*General Star, supra,* 47 Cal.App.4th at pp. 1592-1593.) If an ambiguity cannot be eliminated by the language and context of the policy, then we invoke the principle that ambiguities are construed against the party who caused the uncertainty—the insurer—in order to protect the insured's reasonable expectations of coverage. (*Id.* at p. 1593.)[2]

██ A contract extends only to those things which it appears the parties intended to contract. Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted.

---

[2]Because the trial court found that the Vons policy was negotiated by parties with equal bargaining positions, USF contends the rule that ambiguities are construed against the insurer does not apply. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 823 [274 Cal.Rptr. 820, 799 P.2d 1253].) USF ignores the fact that the exception it relies on does not come into play unless there is evidence the actual provision in dispute was jointly drafted. Evidence that the policy was negotiated is not enough. (*Id.* at pp. 823-824; *Martin Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113, 1134-1135 [47 Cal.Rptr.2d 670].) The trial court made no such finding and there is no such evidence in the record. Accordingly, any unresolved ambiguities will be construed against USF.

We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there. Finally, words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere. (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1485-1486 [237 Cal.Rptr. 473].)

## 2. *The Vons Policy Did Not Preclude Payment of the SIR Through Other Insurance*

USF contends that to be self-insured under an SIR means, as a matter of law, that the insured must pay the SIR amount from its own pocket before an insurer's duty to indemnify begins. In support of this contention, USF relies on practice guide commentaries that suggest the "usual" meaning of the term "self-insured"[3] and on the decision in *City of Oxnard, supra,* 37 Cal.App.4th 1072. USF's arguments and authorities all suffer from the same defect—they bear no relation to the actual terms of the Vons policy.

The plaintiff city in *City of Oxnard* was sued for personal injuries by owners of real property developed on the site of a former waste oil dump. The city entered a joint defense agreement with some of its insurers and the actions eventually settled. Based on its percentage share as specified in the joint defense agreement, the city paid just under $100,000 while the participating insurers paid more than $206,000, for a total settlement of $306,000. The city later sued two other insurers which refused to take part in the joint defense agreement in order to recover a share of the city's defense costs.

The two defendant insurers issued policies expressly stating they provided excess coverage that was available only after the city became legally obligated for a loss in excess of its retained limit or SIR—$100,000 for one policy and $200,000 for the other. Under those policies, the insurers were obligated to share in defense costs only if a judgment or settlement exceeded the SIR amounts.

While the city raised several arguments, only one is relevant here—since the action settled for an amount greater than the combined SIR's, the excess insurers were obligated to contribute to the defense costs. The trial court rejected that argument because the city in fact paid just $100,000 of its own funds. The appellate court affirmed, stating: "Pursuant to the joint defense

---

[3]The term "retention" "usually refers to a portion of the loss the insured itself must pay and that is not insured under any other insurance policy." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 7:384, p. 7A-102.)

agreement . . . , Oxnard's actual share of the settlement was less than $100,000, which was under both SIR amounts. However, according to Oxnard, the other insurers were not 'liable' for the settlement as parties to the action. Therefore, the entire settlement amount should be considered as owed solely by Oxnard. [¶] Respondents' policies expressly stated that they were responsible only for 'ultimate net loss' in excess of the retained amount. Oxnard's other insurers were responsible for approximately two-thirds of the settlement amount according to the joint defense agreement, and Oxnard's approximate share was one-third of the settlement. Oxnard's ulti-mate net loss was represented by the actual amount of its share. There is no way the amount of the entire settlement can be considered a 'net loss.' " (*City of Oxnard, supra,* 37 Cal.App.4th at p. 1078.)

Although *City of Oxnard* might be read to suggest that an insured under a policy with an SIR cannot satisfy the SIR amount through payments made by other insurers, it is important to remember that the language of an opinion must be construed in light of the facts of the particular case, an opinion's authority is no broader than its factual setting and the parties cannot rely on a rule announced in a factually dissimilar case. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1121 [66 Cal.Rptr.2d 337].)

There was little discussion of the SIR terms at issue in *City of Oxnard* apart from the court's synopsis that the policies "expressly stated that only 'excess' coverage was being provided . . ." for the city's "ultimate net loss" in excess of the SIR amounts. (*City of Oxnard, supra,* 37 Cal.App.4th at pp. 1075, 1078.) Pursuant to the terms of the city's joint defense agreement, the city was to pay one-third of the settlement, or approximately $100,000, an amount well below the SIR's, providing clear and uncontradicted evidence that the city was in fact liable for an amount below the SIR's.

We believe that a recent federal case applying California law, *General Star Nat. Ins. Corp. v. World Oil Co.* (C.D.Cal. 1997) 973 F.Supp. 943 (hereafter *World Oil*), provides a far better template against which to analyze the facts of this case.

World Oil was insured by General Star under a policy that ostensibly provided primary coverage subject to a per accident deductible of $100,000 and a yearly aggregate deductible of $150,000, for a combined amount of $250,000. World bought another policy from Hartford providing primary coverage of $250,000 in order to cover its deductible under the General Star policy. World Oil was later sued for personal injuries and tendered its defense to both General Star and Hartford. The case settled for $775,000, comprised of $250,000 from Hartford and $525,000 from General Star.

General Star later sued World Oil to recover $133,688, the difference between what it actually paid and what it would have paid if World Oil had paid the $250,000 deductible. General Star contended that, based on the intent of the parties and the terms of its policy, World Oil was precluded from covering the amount of its deductible through other insurance and was instead obliged to pay the deductible from its own pocket.

Both parties brought cross-motions for summary judgment. General Star's was based on the following evidence: (1) permitting an insured to buy coverage for its deductible violated General Star's risk-sharing philosophy, which motivated its insureds to act more safely; (2) the policy stated that World Oil was obligated to assume and pay a $100,000 deductible and must reimburse General Star for any part of the deductible which General Star might pay; (3) consonant with its policy of requiring the insured to pay its deductible, General Star required World Oil to post a letter of credit for $800,000 to cover any unpaid deductibles; and (4) a clause providing that General Star need only share proportionally in covering claims covered by other primary policies also precluded the use of other coverage to pay the deductible.

In granting summary judgment for World Oil, the court first pointed to World Oil's competing evidence and inferences. These included: (1) there was no evidence General Star ever shared its risk-sharing philosophy with World Oil or told World Oil it could not pay the deductible through other insurance; (2) World Oil acted as would a company which believed it could buy other insurance for the deductible; and (3) the letter of credit was bought before World Oil obtained the Hartford policy and would also protect against the insolvency of other insurers. (*World Oil, supra,* 973 F.Supp. at pp. 947-948.)

The court then held that even though the General Star policy was denominated as primary coverage subject to a deductible, it was in fact transmuted into excess coverage subject to an SIR because General Star's duties to defend and indemnify did not come into play until and unless World Oil's ultimate loss payment on a claim exceeded the $100,000 per occurrence deductible. (973 F.Supp. at pp. 949-950.) As a result, the "other insurance" sharing provisions were not applicable since they applied only as between two competing primary policies. The court also held that because nothing in the policy unambiguously prevented World Oil from insuring the deductible-cum-SIR amount, the language was ambiguous as to whether World Oil was required to pay the deductible from its own funds or could insure that amount elsewhere. That ambiguity was necessarily resolved against the insurer. (*Id.* at pp. 947-948, 951.)

*World Oil* thus reached two important conclusions for our purposes. First, the labels used to define policy terms are not controlling; the terms themselves are. Accordingly, what the insurer in that case dubbed a deductible was held to be in fact an SIR. Second, if the policy terms either permitted the use of other insurance to cover the SIR amount, or were at least ambiguous on that point, then the insured could exhaust the SIR in that manner. An examination of the Vons policy leads us to conclude that Vons too could exhaust its SIR through other insurance.

The SIR in the Vons policy expressly stated that it was "subject to" all of the policy's terms and conditions, which remained unchanged. (Compare *General Star, supra,* 47 Cal.App.4th at pp. 1590-1591, 1593-1594 [failure to fill in an aggregate SIR amount meant that the SIR amount applied per occurrence; SIR held to expressly control because, by its terms, it said the endorsement changed the CGL policy and that if the SIR conflicted with any other policy provisions, the SIR was to control] with *Northland Ins. Co. v. Guardsman Products, Inc.* (6th Cir. 1998) 141 F.3d 612, 619 [policy held to be primary, not excess, in part because SIR did not state that it controlled in case of conflict with other policy terms].) The term "subject to" means "subordinate to." (*Matthews v. Starritt* (1967) 252 Cal.App.2d 884, 887 [60 Cal.Rptr. 857].) There is nothing ambiguous about this language, which meant that the SIR was controlled by the various terms and conditions of the Vons policy.

Among the conditions in the Vons policy was paragraph 9, headed "Other Insurance." It stated, in relevant part: "If other valid and collectible insurance is available to the insured for a loss we cover . . . our obligations are limited as follows: [¶] a. Primary Insurance [¶] This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below. [¶] b. Excess Insurance [¶] This insurance is excess over any valid and collectible other insurance, whether primary, excess, contingent or on any other basis: [¶] (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work'; . . . [¶] . . . [¶] When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of: [¶] (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and [¶] (2) The total of all deductible and self-insured amounts under all that other insurance. [¶] We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not brought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this coverage."

The term "other valid and collectible insurance" simply means another policy which is legally valid and underwritten by a solvent carrier. (*Hellman v. Great American Ins. Co.* (1977) 66 Cal.App.3d 298, 304 [136 Cal.Rptr. 24].) The term "your work" was defined in the Vons policy as, among others, work or operations performed by Vons or on its behalf. Under these provisions, USF's coverage would be excess to any other valid insurance that provided fire, builder's risk, extended risk or similar coverage for Vons's work operations.

As USF correctly points out, ordinarily the net effect of an SIR is to make the policy excess to any primary coverage, with the excess insurer's obligations triggered only if and when the primary coverage is exhausted. (*General Star, supra,* 47 Cal.App.4th at p. 1593.) USF contends that Vons's obligations to pay the SIR without assistance from other insurance was that primary coverage. Our task is to interpret the policy at issue, whose terms control our analysis. (*California Pacific Homes, Inc. v. Scottsdale Ins. Co.* (1999) 70 Cal.App.4th 1187, 1193-1194 [83 Cal.Rptr.2d 328].) Thus we must determine why the SIR—which standing alone would ordinarily make the Vons policy excess—was made subject to policy provisions which also stated the insurance was excess in the event that other insurance was available.

If, as USF contends, the SIR provided excess coverage which precluded payment of the SIR by other insurance, it must explain why that provision was expressly made subject to policy terms which also provided that USF's coverage was excess if any other valid insurance were available for the same occurrence. It has offered no such explanation and has failed to acknowledge or discuss the language which made its SIR subject to the other policy terms and conditions. We therefore deem the issue waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 [46 Cal.Rptr.2d 119].)[4]

We alternatively hold that the SIR, construed in light of the other insurance provisions to which it was subject, in fact permitted payment of the SIR

---

[4]Although USF understandably might wish that the "subject to" language were not part of the SIR, we cannot omit this language nor insert other language favorable to USF. We may only interpret the terms as they are. (*Levi Strauss & Co. v. Aetna Casualty & Surety Co., supra,* 184 Cal.App.3d at pp. 1485-1486.) In stark contrast to the SIR in the Vons policy is that found in the Longs policy, which was in evidence below. Instead of stating that the SIR endorsement was subject to the other policy terms and conditions, that SIR simply stated that it formed a part of the overall policy. Although our decision does not apply to the Longs policy, which is not at issue here, that policy also appears to have tackled the issue of other insurance, stating: "In the event there is any other insurance, whether or not collectible, applicable to an 'occurrence', claim or suit within the Retention Amount, *you will continue to be responsible for the full Retention Amount before the Limits of Insurance under this policy apply.*" (Italics added.) Regardless, if USF wanted to make it clear that Vons was required to pay the SIR amount, it should have said so.

amount through other valid and collectible insurance. That is the most reasonable construction given that the SIR was subordinate to the other insurance provisions. If nothing else, the conflict between USF's interpretation of the SIR and the other insurance provisions renders the SIR ambiguous on this point. Nowhere does the SIR expressly state that Vons itself, not other insurers, must pay the SIR amount. Because the SIR was subject to the other insurance provisions, which also made the Vons policy excess if there were another policy covering the accident, Vons as a reasonable insured could read the policy as permitting the use of other insurance proceeds to cover the SIR amount. (Accord, *World Oil, supra,* 973 F.Supp. at pp. 947-948, 951.)

### 3. *Allocation of Liability*

USF contends that even if Vons could exhaust the SIR through other insurance, it was still obligated to show that the entire $1 million payment under the Longs policy was allocated to Vons as part of the McKernan settlement before it could claim a right to reimbursement of the $539,905 which Vons paid. If less than $1 million of the Longs policy proceeds were allocated to Vons, then its right to reimbursement would be reduced accordingly, USF argues. Because the McKernan settlement was silent on this point, because there were other parties to that settlement, and because Vons introduced no evidence at trial to show whether an allocation was made, the court erred in awarding Vons any money, according to USF.

We begin, as always, with the policy terms. USF was obligated to pay that portion of Vons's ultimate net loss which exceeded the $1 million SIR. The policy defined "ultimate net loss" to mean all sums that Vons was legally obligated to pay by way of judgment or settlement.

Unlike *City of Oxnard, supra,* 37 Cal.App.4th at page 1078, where the city's joint defense agreement provided clear and uncontradicted evidence that the city was legally obligated to pay less than its full SIR in settling, the McKernan settlement called for payment of the settlement proceeds by the defendants as a group, without allocation or severance of their liabilities. This led the trial court to conclude that although the other parties were part of the settlement, Vons was jointly and severally liable to pay the entire amount. The trial court was correct, since such an obligation is presumed to be joint and several. (Civ. Code, §§ 1430-1432, 1659.) As such, Vons was legally obligated to pay the entire settlement amount.

USF's insistence that Vons still had to show how much of the settlement was allocated to Vons once again ignores the plain meaning of its own policy. Vons had to show that it became legally obligated to pay more than $1 million and produced such evidence in the terms of the McKernan

settlement. The trial court's finding is supported by other evidence—the $1 million check from National Union was issued solely to Vons and the annuity required by the McKernan settlement was purchased by National Union and Vons, without mention of any other parties.

At bottom, USF appears to contend that Vons engineered the McKernan settlement to make it look as though Vons alone was paying the proceeds in order to satisfy the SIR in the Vons policy. It said as much in its opening brief, characterizing the form of the settlement as a "subterfuge" carried out "to make the transaction seem something other than it was."

The SIR in the Vons policy expressly imposed a duty of good faith on both parties, requiring each "to consider the interests of the other equally with its own to evaluate settlement offers as though it was liable for the full amount of the claim or suit." If USF believed Vons breached its duty of good faith, it could have raised the issue by way of affirmative defense or cross-complaint. Had it done so, discovery about the true nature of the McKernan settlement would have been proper, despite the settlement's confidentiality provisions. (*Home Ins. Co. v. Superior Court* (1996) 46 Cal.App.4th 1286, 1291-1292 [54 Cal.Rptr.2d 292].) The record does not show that USF ever raised such an affirmative defense or filed a cross-complaint alleging bad faith.

We understand USF's concerns, but we cannot rewrite its policy, which defined ultimate net loss to be all sums for which Vons became legally obligated. The trial court did not err in concluding that Vons became legally obligated to pay the entire settlement amount. As a result, there was substantial evidence that the $1 million SIR in the Vons policy was exhausted, triggering USF's obligation to reimburse Vons for the rest.[5]

### DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent Vons to recover its costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

On March 6, 2000, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 24, 2000.

---

[5]As a result of our holding, we need not reach the issues posed by USF's failure to take part in the McKernan settlement.