[No. A027729. First Dist., Div. Three. Aug. 29, 1986.*]

LEVI STRAUSS & CO., Plaintiff and Appellant, v.
AETNA CASUALTY AND SURETY COMPANY,
Defendant and Appellant.

**[Opinion certified for partial publication.†]**

*Review granted November 26, 1986. Review dismissed and opinion ordered published June 3, 1987.

†Sections C and D of part II and all of part III are not certified for publication. (Cal. Rules of Court, rule 976(b) and 976.1.)

1480

---

---

**COUNSEL**

Robert J. Vizas, Peter H. Goldsmith and Heller, Ehrman, White & McAuliffe for Plaintiff and Appellant.

David E. Bordon, Michael B. McGeehon, David E. Wood and Sedgwick, Detert, Moran & Arnold for Defendant and Appellant.

---

**OPINION**

**SCOTT, J.**—Levi Strauss & Co. (Levi) filed a complaint on a fidelity bond against Aetna Casualty and Surety Company (Aetna), seeking indemnification for losses resulting from the 1977 fraud of one of its employees in Buenos Aires, Argentina. Trial was by jury and Levi was awarded $527,270. Both Levi and Aetna have appealed. We affirm the judgment.

Between 1977 and the 1984 trial, the value of the Argentine peso against the dollar plunged precipitously, from approximately 350 pesos per dollar in April 1977 to 290,720 pesos per dollar in February 1984. As this case illustrates, when the determination of damages requires a court to consider currencies which fluctuate with respect to each other, the choice of date for conversion of the foreign currency can have a significant effect on the amount awarded. In selecting that date, courts generally look either to the rate prevailing on the date judgment was entered (i.e., the judgment-day rule) or to the rate in effect when the breach of contract or duty occurred (i.e., the breach-day rule). We have concluded that the trial court properly determined both that the breach-day rule governed in this case and that the date of breach for purposes of applying that rule was February 15, 1980, when Levi submitted its proof of loss to Aetna. We reject Levi's argument for a conversion rate as of the date its losses were discovered in 1977. The other issues in Levi's appeal and in Aetna's cross-appeal are discussed in

that portion of this opinion not certified for publication. (Cal. Rules of Court, rules 976(b) and 976.1.)

## I

In 1977, Levi was insured by Aetna under a "Blanket Crime Policy" which provided coverage for losses sustained through fraudulent acts committed by its employees. By endorsement, the policy covered Levi's international subsidiaries, including its Argentine subsidiary, Complejo Industrial de Confecciones, S.A.I.C. (CICSA).

At the time, Argentina was suffering from an exceedingly high rate of inflation. As a result, the term of most commercial loans was less than 30 days. A 180-day commercial loan was considered long term and was the maximum term generally available. Interest on these loans was prepaid, or taken out of the face amount of the loan. That procedure coupled with a high stated rate of interest resulted in an effective interest rate at times in excess of 100 percent. Despite the high rates, Levi's policy at the time was to borrow Argentine pesos for its operations, because regulations imposed by the Argentine government made the cost of borrowing United States dollars even higher.

In early 1977, Andres Perez was the treasurer of CICSA, responsible for cash management, projecting short-term cash requirements, and borrowing funds for operations. Perez negotiated a series of loans in April and May of that year which significantly raised Levi's outstanding debt.

At the time, loans could be obtained from banks or from other companies known as "financieras," the largest of which was La Agricola, a reputable institution authorized by the Argentine government. In a series of 11 loan transactions initiated by Perez, CICSA borrowed approximately 2.95 billion pesos at high rates of prepaid interest. None of the lenders listed for these loans on CICSA's books were authorized as financieras by the government. They apparently existed only on paper and operated in what one witness described as the "gray area" of Argentine law. These so-called "phantom" financieras immediately sold the notes to La Agricola at a discounted rate of interest. La Agricola paid for the notes with checks made payable to the bearer; frequently several such checks were issued for each loan transaction. From the nature of the transactions and particularly because of the unusual bearer checks, Argentine banking expert Dr. Jorge Hayzus was of the opinion that the transactions were "deviational," fraudulent, and organized for the benefit of those who made them. He believed the transactions could not

have been carried out without the involvement of Perez, the probable author of the scheme.

By January or February 1978, Levi officials and investigators became more fully informed of and suspicious about the nature of the transactions and reported the matter to the Argentine police, which commenced a criminal investigation. In September 1978, Levi notified Aetna of its potential claim. The policy required Levi to file a detailed proof of loss within four months after discovery of the loss. On October 18, 1978, Levi requested a 90-day extension of time to file the proof of loss. Levi's letter to Aetna explained that a police investigation had commenced but that jurisdiction of the case had been preempted by Argentine courts, which were holding all the records. Levi was attempting to gain access to those records and explained that until that time, it was unable to file its formal proof of loss. Aetna responded by letter, granting the extension and stating that a proof of loss filed on or before January 18, 1979, "shall have the same force and effect as if filed on October 18, 1978." Over the next 18 months, Levi requested and Aetna granted several additional extensions; in each letter, Aetna repeated that "same force and effect" language.

Throughout this period, although the value of the peso was plummeting, Levi and Aetna representatives never discussed what date would be used to value Levi's losses. At meetings between Levi and Aetna in early February 1980, Levi submitted revised calculations of its loss, estimating it to be in excess of $2 million. In those calculations, Levi was using a conversion rate as of 1977, and Aetna representatives raised no objection to that computation. Later, however, Jack Ryan of Aetna's home office suggested by memorandum to Aetna's local claims representatives that use of the 1977 conversion rate was not required and that the appropriate conversion rate would be that in effect at the time of settlement.

Levi submitted a proof of loss on February 15, 1980. In a letter dated March 17, 1980, Aetna informed Levi that any loss which was proved "will be based on the conversion rate of the date of payment of settlement." This litigation ensued immediately thereafter.

Before trial, Levi moved for "summary adjudication" of what exchange rate should be used in calculating its damages. Levi argued that under standard contract interpretation, case law, and equitable principles including estoppel, the proper exchange rate should be that in effect in 1977 when it incurred its loss. Aetna opposed the motion, arguing that the conversion date should be either the date of judgment or the date of its breach of the insurance contract. That date, Aetna reasoned, was May 15, 1980, 90 days

after Levi filed its proof of loss. Under the policy, Levi would have been entitled to bring an action against the insurer no sooner than that date.

The trial court granted Levi's motion for summary adjudication but did not accept Levi's theory as to the proper conversion date. The court held that if a breach of the policy should be established, the controlling rate was that in effect when payment became due under the policy and Levi's cause of action arose. According to the court, that date was February 15, 1980, when Levi submitted its proof of loss. In a supplementary order of clarification, the court (1) held that Aetna was not estopped from asserting that the proper conversion rate was that in effect when the proof of loss was submitted; and (2) stated that no evidence had been presented or considered as to whether the parties agreed to use a conversion date earlier than February 15, 1980.

At trial, the jury was instructed to use the conversion rate as of February 15, 1980, unless it found that Levi and Aetna had agreed to use the rate in effect on October 18, 1978. The jury was also instructed that any award had to be reduced by the $100,000 policy deductible.

The jury awarded Levi $527,270. That sum is the amount Levi's expert calculated as the out-of-pocket loss using the February 15, 1980, rate of exchange, less the deductible. Thus the jury impliedly found that there was no agreement to use an earlier date and rejected Levi's claim to have suffered loss of use damages.

## II

### *Levi's Appeal*

#### A.

 The trial court relied on the principle known as the breach-day rule to determine the appropriate conversion rate. First, Levi contends that the breach-day rule is inapplicable because under the terms of the insurance policy the date of loss is the proper conversion date.

The policy provides coverage for loss of "Money, Securities and other property." "Money" is defined as "currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public." "Securities" are also defined, but there is no definition of "other property."

With respect to valuation of losses, section 9 of the policy states: "In no event shall the Company be liable as respects Securities for more than the actual cash value thereof at the close of business on the business day next preceding the day on which the loss was discovered, *nor as respects other property, for more than the actual cash value thereof at the time of loss; . . .*" (Italics added.)

Initially, Levi argues that its foreign currency loss was a loss of "other property" within the meaning of section 9, the valuation section; therefore, Levi argues, the plain language of that section entitles it to a conversion rate as of the date of the currency loss. In the alternative, Levi argues that if that interpretation of the policy is rejected, the policy is at best ambiguous with respect to the rate of exchange of currency loss. Given that ambiguity, Levi reasons, the policy must be construed against Aetna and in favor of Levi's reasonable expectation that the date-of-loss exchange rate would be applied.

Aetna responds that section 9 is inapplicable to Levi's loss of currency. According to Aetna, Levi's argument ignores both the coverage section of the policy which separately lists securities, money, and "other property," and the definition section which defines money as including currency. Aetna's argument, which was impliedly accepted by the trial court when it ruled on Levi's summary judgment motion, is that the policy is not ambiguous and does not require construction. Section 9 does not mention the valuation of a money loss because when the insured suffers a loss of money or currency, including foreign currency, it is entitled to recover the amount of money or currency lost, no more and no less, and without regard for any fluctuations in value. While actual payment for lost foreign currency must be made in dollars, the policy neither insures against a decline in value of the currency nor protects the insurer from an increase in its value against the dollar.

It is true that ambiguities and uncertainties in an insurance policy are to be resolved against the insurer. *If semantically permissible,* the contract will be given a construction which will fairly achieve its object of providing indemnity for the loss to which the insurance relates. "The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy." (*White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309].)

It is equally true, however, that words used in an insurance policy are to be interpreted according to their plain meaning. "Courts will not adopt a

strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) A contract extends only to those things concerning which it appears that the parties *intended* to contract. (*Victoria* v. *Superior Court* (1985) 40 Cal.3d 734, 739 [221 Cal.Rptr. 1, 710 P.2d 833], citing Civ. Code, § 1648.) In construing a contract, the court's function is to ascertain and declare what, in terms and substance, is contained in that contract, and not to insert what has been omitted. (*Jensen* v. *Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 790-791 [345 P.2d 1].) The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there. (*Sayble* v. *Feinman* (1978) 76 Cal.App.3d 509, 515 [142 Cal.Rptr. 895].) Courts will not add a term about which a contract is silent. (*Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].) Finally, words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere in that instrument. (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 358 [139 P.2d 908].)

 Aetna's interpretation of the contract is persuasive. The policy insures against loss of money, securities, and "other property." "Money" is explicitly defined and includes "currency." Clearly under the contract "money" and "other property" are two separate categories, and one does not include the other. Thus the policy's provision on the valuation of "other property" cannot be read to encompass valuation of a foreign currency loss. Nor is the contract ambiguous on this point. Instead, it is silent. There is simply no provision in the policy relating to the valuation of a foreign currency loss, and this court cannot add a term which Levi now wishes were there.

### B.

 In the alternative, Levi contends that cases applying the breach-day rule to determine a currency conversion date compel the conclusion that its loss should be converted into dollars at the 1977 exchange rate. Levi reasons that the purpose underlying the breach-day rule is to make the plaintiff whole, and that the only way to accomplish that purpose in this case is to convert its loss as of the date of the fraud.

As we have already stated, when the determination of damages requires the conversion of foreign currency, courts generally apply either the judgment-day or the breach-day rule. (Compare *Hicks* v. *Guinness* (1925) 269 U.S. 71 [70 L.Ed. 168, 46 S.Ct. 46]; *Deutsche Bank* v. *Humphrey* (1926)

272 U.S. 517 [71 L.Ed. 383, 47 S.Ct. 166]; see generally, *Newmont Mines Ltd.* v. *Hanover Ins. Co.* (2d Cir. 1986) 784 F.2d 127, 130-132, 138; *In re Good Hope Chemical Corp.* (1st Cir. 1984) 747 F.2d 806, 809-812; *Vishipco Line* v. *Chase Manhattan Bank, N. A.* (2d Cir. 1981) 660 F.2d 854, 865-866; *Jamaica Nutrition Holdings* v. *United Shipping* (5th Cir. 1981) 643 F.2d 376, 379-381; *Compania Engraw Com'l E. Ind.* v. *Schenley Dist. Corp.* (9th Cir. 1950) 181 F.2d 876, 879.)

As the court in *In re Good Hope Chemical Corp., supra,* 747 F.2d 806 recently pointed out, courts and commentators have not unanimously agreed upon a formula for determining when to apply each rule. The weight of authority, the court explained, looks to the jurisdiction in which the plaintiff's cause of action arose. If the obligation arose entirely under foreign law, the judgment-day rule applies; damages incurred in foreign currency are converted into dollars at the rate prevailing on the date of final judgment. On the other hand, if the plaintiff has a cause of action under American law, the breach-day rule applies, and the applicable rate is that prevailing when the cause of action arose. (*Id.,* at pp. 810-812; see also *Jamaica Nutrition Holdings* v. *United Shipping, supra,* 643 F.2d 376, 379-381; *Compania Engraw Com'l E. Ind.* v. *Schenley Dist. Corp., supra,* 181 F.2d at pp. 878-879 [breach of contract action between Argentine seller and California buyer; 9th Cir. holds that California courts would apply breach-day rule].) As Levi's cause of action was for breach of contract under California law, the trial court correctly concluded that the governing rule in this case was the breach-day rule. Although Aetna argued at trial for the applicability of the judgment-day rule, it has not renewed that argument on appeal.

■ The more difficult question is whether the trial court properly determined the breach date for purposes of applying the rule.

What has become known as the breach-day rule was utilized by the Supreme Court in *Hicks* v. *Guinness, supra,* 269 U.S. 71. In that case, a German firm owed a debt to an American company under a contract providing for payment in this country of German marks. The Supreme Court held that when the contract was broken by a failure to pay, the American firm had a claim here for damages in dollars. It was then that the event had come to pass upon which the debtor's liability became "'absolute as fixed by law,'" and the plaintiff was entitled to claim the amount of the loss, valued in dollars as of that date. (*Id.,* at pp. 79-80 [70 L.Ed. at pp. 170-171].)

When the breach-day rule was applied more recently in *In re Good Hope Chemical Corp., supra,* 747 F.2d 806, the court emphasized that, under

*Hicks,* the attempt is to give the plaintiff his expectancy as of the date his loss became definite. In *Good Hope,* a Texas company had a contract with a West German manufacturer, payable in marks. Instead of paying for the goods ordered, the Texas company filed a voluntary petition for reorganizing under the Bankruptcy Act. At issue on appeal was the exchange rate selected by the bankruptcy court to compute the German firm's damages for the breach of contract. After holding that the breach-day rule applied, the appellate court declared that it was "not obvious" what date constituted the breach, given the bankruptcy. It rejected the argument that the breach occurred in 1975 when the bankruptcy petition was filed. Instead, it held that the breach was complete and compensable loss occurred only when the contract was formally rejected as of the 1980 date specified in the company's "Plan of Arrangement" under the Bankruptcy Act. (*Id.,* at p. 812, & fn. 7.)

In a footnote of interest, the court commented that while the object of the breach-day rule is to restore the plaintiff to the position he would have enjoyed had the contract not been breached, the rule may fail to compensate plaintiffs fully when foreign currency has appreciated in value relative to the dollar. Nevertheless, the court considered a clearly defined rule rather than a flexible principle to be of considerable importance in commercial transactions. Thus "[t]he breach date selected should be the date at which the contract is broken and the loss incurred, rather than some other date that gives plaintiffs . . . the fullest possible recovery." (*Id.,* at pp. 812-813, fn. 8.)

In another application of the breach-day rule, the court in *Jamaica Nutrition Holdings* v. *United Shipping, supra,* 643 F.2d 376, also focused on when the plaintiff's damages became certain. Soybean oil was sent by ship from Louisiana to a purchaser in Jamaica. Traces of molasses were discovered in the oil, which then had to be reprocessed by the purchaser; the cost of the reprocessing was incurred in Jamaican dollars. The appellate court stated that when the shipowner breached its duty to make the vessel seaworthy, the plaintiff had a claim for damages, with only the exact amount of those damages remaining to be calculated. The court then concluded that the damages should be converted into United States dollars on the date the reprocessing costs were incurred and paid for in Jamaica. (*Id.,* at pp. 380-381.)

While none of the foregoing cases dealt with a dispute between an insured and its insurer, such a conflict was at issue in a very recent case, *Newmont*

*Mines Ltd.* v. *Hanover Ins. Co., supra,* 784 F.2d 127. The question in that case was whether, not how, the breach-day rule should be applied. Nevertheless, the case supports the correctness of the trial court's ruling in this case, as the date of breach which it selected is similar to that utilized by the trial court and affirmed by the appellate court in *Newmont Mines.*

*Newmont Mines* involved damages resulting from the collapse of part of the roof of a mine in Canada. After a jury trial, two insurers who had refused to indemnify the mineowner were found liable for repair expenses. The court held that the breach-day rather than the judgment-day rule applied to convert the award from Canadian into United States dollars. Although the roof had collapsed in March 1979, the appellate court affirmed the trial court's determination that the proper exchange rate was that prevailing on the date the insurers became obligated under the terms of the policies to pay the claims, i.e., in February 1980. (*Id.,* at pp. 130-132, 138.) In other words, the *Newmont Mines* court looked to the date when the insurers' liability "'became absolute as fixed by law'" (*Hicks* v. *Guinness, supra,* 269 U.S. at p. 79 [71 L.Ed. at p. 171]) rather than to the date of the underlying event which led to the insured's claim. The trial court's similar approach in this case was proper. Not until Levi submitted its proof of loss did Aetna's liability under the insurance contract become fixed or certain.[1]

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III†

*Aetna's Cross-appeal*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[1]In *Newmont Mines* the critical date was that specified in the policies for payment after the filing of the proof of loss (see *Newmont Mines Ltd.* v. *Hanover Ins. Co., supra,* 784 F.2d at p. 131), whereas in this case the trial court determined that Levi's loss became certain when it submitted its proof of loss. Aetna argued before the trial court for a date 90 days after submission of the proof of loss, i.e., when Levi became entitled to sue according to the terms of the policy. On appeal, however, Aetna does not challenge the trial court's proof-of-loss date. At oral argument Aetna explained that in view of the other issues in the case, it had decided not to "quibble" over the 90 days.

*Sections C, D of part II of this opinion are not certified for publication. (See fn., *ante,* at p. 1479.)

†Part III of this opinion is not certified for publication. (See fn., *ante,* at p. 1479.)

## IV

Judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.