Filed 6/14/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SERIES AGI WEST LINN OF APPIAN GROUP INVESTORS DE LLC,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT EVES,<br><br>     Defendant and Appellant. | A135832<br><br>(Marin County<br>Super. Ct. No. CIV-1201214) |

Robert Eves appeals from the Judicial Council form AT-120 Right to Attach Order and Order for Issuance of Writ of Attachment. The appeal presents a single issue, one that appears to be an issue of first impression, not only in California, but in the entire country: If a surety specifically excludes a specified asset from a continuing guaranty, are the proceeds from the sale of that asset still excluded when the surety is called to answer for its guaranty?

The novelty of the issue notwithstanding, we resolve it as simply one of contractual interpretation. Our examination of the guaranty, together with other documents executed at the same times, shows that Eves could have inserted language extending the exclusion from the assets to the sale proceeds of those same assets. He simply failed to do so. Judicially correcting that omission would amount to an improper rewriting of the parties' contract. For this reason we agree with the trial court that the proceeds are not exempt from being attached to satisfy the surety's obligation.

**BACKGROUND**

According to the papers of plaintiff Series AGI West Linn of Appian Group Investors DE, LLC (Series AGI), in April 2007 it lent $3.1 million to VPC-OR West Linn

1

Limited Partnership, LLC (VPC-OR) for the development of a "commercial marketplace" in West Linn, Oregon. The loan provided for interest at 13 percent per annum, and an "exit fee of the amount equal to an annualized thirteen percent . . . of the original principal balance" of the loan.[1] The loan was secured by a deed of trust, which was junior to another deed of trust held by a financial institution that had loaned VPC-OR $18.4 million.

Contemporaneously, Eves executed a "Continuing Guaranty" by which he "unconditionally guarantees and promises to pay Lender [Series AGI] . . . any and all indebtedness . . . of Borrower [VPC-OR] to Lender."[2] A "Guaranty of Loan Addendum" setting out seven categories of assets as "Schedule 1," added: "The following assets are

---

[1] The pertinent language in VPC-OR's promissory note reads: "**Exit Fee**. In addition to all other sums due from Borrower [VCP-OR] to Lender [Series AGI] under this Note, on the Maturity Date [April 30, 2009], or upon any acceleration thereof, whether by default, application of insurance proceeds, applications of condemnation award, or otherwise, Borrower shall pay to Lender an exit fee ('Exit Fee') in the amount equal to an annualized thirteen percent of the original principal balance of the Loan." Another provision of the note allowed that if VPC-OR failed "to pay any sum . . . when due . . . the unpaid principal sum evidenced by this Note, all accrued and unpaid Interest thereon . . . shall, at the option of the Lender, . . . become immediately due and payable, and . . . may be enforced and recovered at once."

[2] A joint obligor on the guaranty was Venture Development Corporation, Inc., which was the general partner of VPC-OR. Eves signed the guaranty on behalf of Venture Development Corporation, Inc. as its president. There are two related entities, Venture Professional Centers and Venture Commerce Centers, both of which are limited liability companies. Eves is the president and secretary of Venture Commerce Centers, which is interestingly also designated on several documents as the general partner of VPC-OR.

When Series AGI filed for the attachment, one of its attorneys attached as an exhibit to his declaration a "Venture Corporation and Related entities Organizational Chart" provided by Eves. It appears from this chart that Eves owns 100 percent of Venture Professional Centers and Venture Commerce Centers, and 99 percent of 46 other limited liability companies and limited partnerships.

None of these other entities figures on this appeal. The point of recounting their existence is to establish that Eves is no stranger to sophisticated financial transactions. Indeed, in his brief he describes himself as presiding over a "business empire."

excluded from the Robert J. Eves personal Guaranty: [¶] . . . [¶] The personal residence of Robert J. Eves at Via Regina, 27 Moltrasio, Como, Italy and its contents."[3] The parties expected the project to be completed by the end of April 2009. But it was not to be.

Series AGI's deed of trust was extinguished when the senior lender foreclosed. VPC-OR made no payments on the loan, and Eves refused to honor his guaranty. In March 2012 Series AGI filed suit to recover approximately $6.3 million from VPC-OR, or Eves, together with prejudgment interest, and attorney fees, according to the terms of the loan agreement and the continuing guaranty.[4] One month after it filed its complaint, Series AGI applied for a prejudgment order of attachment (Code Civ. Proc., § 484.010).

---

[3] The other excluded assets were Eves's "personal residence" in Mill Valley, "personal and/or real property" owned by specified family trusts, and "automobiles owned and used by the . . . family members" of Eves and his then wife.

[4] The leading treatise explains how Eves's $3.1 million guaranty could balloon to more than twice that amount.

First, "Where the guaranty is of a money obligation, the amount recoverable by the creditor in an action against the guarantor is the sum which is due according to the terms of the instrument. Together with this sum, the guarantor is generally liable for interest on the debt from the time of default by the principal. This liability for interest increases the amount . . . but it is justified because of the fact that the guarantor puts himself in the place of the principal and agrees to perform all that the principle is liable for. . . . [¶] . . . [¶] The allowance of interest is proper even though its effect may be to increase the recovery of the guarantor beyond the limit of liability specified in his contract of guaranty." (Stearns, The Law of Suretyship (Elder rev. ed. 1951) § 4:19, pp. 85-86, fns. omitted.) "Interest normally commences to run against the principal from the date that he violates his obligation and, since the surety is liable for the principal's entire debt, he will be liable also for such interest on the debt." (*Id*., § 8:19, p. 283.) California follows this rule. (*Berg Metals Corp. v. Wilson* (1959) 170 Cal.App.2d 559, 569-570; *Burns v. Massachusetts Etc. Ins. Co*. (1944) 62 Cal.App.2d 972, 975.) Given that VPC-OR made no payments on the loan for five years, the amount of interest that would accrue at an annual rate of 13 percent would be considerable.

Second, the "exit fee," which would add 13 percent of the $3.1 million principal (see fn. 1, *ante*), appears to be in the nature of a penalty or liquidated damages provision. (Stearns, The Law of Suretyship, *supra*, § 8:17, p. 280.)

3

In his combined opposition and claim of exemption (Code Civ. Proc., §§ 484.060, 484.070), Eves opposed only that part of the application aimed at "proceeds from the sale" of the Como house, which "[b]y the terms of the personal guarantee upon which plaintiff's application for attachment . . . is based . . . are 'excluded' from attachment." Eves based this conclusion on his reading of the guaranty's paragraph 13: "**Limitation of Recovery**. [¶] Notwithstanding the foregoing, the personal Guaranty of Eves may only be collected from assets not expressly excluded, as provided in the Asset Exclusion Schedule for Eves is attached hereto as Schedule 1; provided such limitation shall be inapplicable in the event Eves or any affiliate of Eves supplements or enhances in any material manner any Excluded Asset but only to the extent of such supplement or enhancement."

Series AGI's application was submitted on papers, exhibits, and declarations. Series AGI's first declaration, by attorney Stephen Preonas, concerned the amount of attorney fees Series AGI was likely to incur, together with an explanation of the damages it was seeking. The second, by Jon Lotter, Series AGI's manager, authenticated a number of attached exhibits, including the guaranty, and narrated the history of the planned project.

Eves responded with a declaration by attorney John E. Carey, Jr., that simply authenticated an attached copy of the guaranty. Eves himself provided two declarations. The first purported to set out Eves's "understanding" of the guaranty. The trial court sustained Series AGI's objections that virtually all of Eves's declaration was speculation, opinion, or otherwise lacked foundation.

Lotter then filed a supplemental declaration explaining how paragraph 13 came to be included in the guaranty. The final declaration was the supplemental one by Eves,

---

In addition, the underlying agreement between VPC-OR and Series AGI, as well as the guaranty, allows for recovery of attorney fees, so Eves could also be liable for "all expenses, costs, charges, and legal fees reasonably incurred." (*T&R Painting Construction, Inc. v. St. Paul Fire & Marine Ins. Co*. (1994) 23 Cal.App.4th 738, 744-745; *Gold v. Maxwell* (1959) 176 Cal.App.2d 213, 219; *College Nat. Bank v. Morrison* (1929) 100 Cal.App. 403, 408.)

4

which is the only source of particulars regarding the sale of his Italian residence:  "I sold that property in the summer of 2011.  The proceeds of the sale . . . were all cash and that cash has been deposited in various accounts.  No part of the proceeds of [the] sale has ever been comingled with any other funds.  The sale proceeds have always been easily identifiable because they have been in segregated accounts as I have drawn them down to satisfy various obligations."[5]  The apparent purpose of this explanation was to buttress Eves's claim that "where collateral is sold, the secured creditor's security interest automatically attaches to the proceeds of sale.  Cal. U. Com. Code, § 9315(a)(2) ('A security interest attaches to any identifiable proceeds of collateral.')"

Following a brief hearing, the trial court made an order denying "Eves' claim of 'exemption' for the Como, Italy property" proceeds and granting Series AGI's application for an order of attachment.  Eves timely sought review of this appealable order.  (Code Civ. Proc., § 904.1, subd. (a)(5).)

## REVIEW

### Preliminary Matters And The Scope Of Our Review

Although the parties do not suggest that any other documents executed contemporaneously with the guaranty (i.e., VPC-OR's promissory note, security agreement, and deed of trust) are useful in ascertaining the scope and meaning of the guaranty, these other instruments may be considered for that purpose.  (Civ. Code, §§ 1642, 1647; *Davenport v. Stratton* (1944) 24 Cal.2d 232, 244-245.)  Consideration of the other documents is particularly appropriate because they are referenced on each of the pages of the guaranty.  (*Goodwin v. Nickerson* (1875) 51 Cal.166, 169; *Fidler v. Board of Trustees* (1931) 112 Cal.App. 296, 309.)

The Attachment Law (Code Civ. Proc., §§ 481.010-493.060) requires the party seeking a prejudgment attachment to demonstrate the probable validity of its claim, i.e., that it is "more likely than not that the plaintiff will obtain a judgment against the

---

[5] The record does not establish the value of the Como property at any time.  In short, the amount of the proceeds available for attachment is unknown.

5

defendant" (Code Civ. Proc., §§ 481.190, 484.090, subd. (a)(2).).  An attachment is properly issued in an action involving a contractual claim of money of a fixed or ascertainable amount of more than $500 (Code Civ. Proc., § 483.010, subd. (a)).  An attachment may be issued against a natural person only if the claim arises "out of the conduct by the defendant of a trade, business, or profession."  (*Id.*, § 481.010, subd. (c).) A trial court's findings on these issues will be upheld if supported by substantial evidence.  (Code Civ. Proc., § 484.090, subd. (a); *Lorber Industries v. Turbulence, Inc.* (1985) 175 Cal.App.3d 532, 534-535; *Nakasone v. Randall* (1982) 129 Cal.App.3d. 757, 762.)  However, none of the trial court's findings on these points is challenged by Eves.[6]

Although the precise point does not appear to have been authoritatively established, it appears from some statutory language and case law that a claim of exemption upheld by the trial court is also judged according to the substantial evidence standard.  (See Code Civ. Proc., § 484.090, subd. (b) ["If . . . the court *finds* that the defendant has failed to prove that all the property sought to be attached is exempt from attachment"] italics added; *Schwartzman v. Wilshinsky* (1994) 50 Cal.App.4th 619, 626 [whether account is meant for individual's retirement, and thus exempt from levy, is substantial evidence question]; *Yaesu Electronics Corp. v. Tamura* (1994) 28 Cal.App.4th

---

[6] At the end of his reply brief, Eves argues that the recent decision in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 undermines the trial court's finding that Series AGI had demonstrated the validity of its claim.  The decision deals with an arcane aspect of the parole evidence rule as applied to a contract allegedly tainted by fraud.  But as neither fraud nor the parole evidence rule was mentioned by Eves in opposing Series AGI's attachment request, we discern no basis for reading the trial court's finding as undermined by this change in the law.  Moreover, because the issue of fraud was not made to the trial court, we have proceeded in conformity with the principle that " 'when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding. . . .' " (*Edwards v. Comstock Insurance Co.* (1988) 205 Cal.App.3d 1164, 1167, quoting *Smith v. Occidental Etc. Steamship Co.* (1893) 99 Cal. 462, 470-471.)  That said, because the attachment order is a prejudgment remedy, we do not foreclose the issue from being presented in subsequent proceedings before the trial court.

8, 14 [same]; but see Code, Civ. Proc., § 484.090, subd. (c) ["If the court *determines* that property of the defendant is exempt from attachment, in whole or in part, the right to attach order shall describe the exempt property and prohibit attachment of the property"], italics added.)

However, because there are no contested issues of fact, the issue becomes one of law. (*Continental Casualty Co. v. Hartford Acc. & Indem. Co*. (1966) 243 Cal.App.2d 565, 570.) Thus, it is our independent duty is to interpret Eves's guaranty in a manner that will effectuate its purpose. (Civ. Code, § 1636; *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 39; *U.S. Leasing Corp. v. DuPont* (1968) 69 Cal.2d 275, 284-285, 290.)

### Analysis

A guaranty is a form of surety, whereby the guarantor "promises to answer for the debt . . . of another." (Civ. Code, § 2787) A guaranty is a form of contract and subject to the usual rules governing contract interpretation. (Civ. Code, § 2837; Rest.3d Suretyship and Guaranty, § 14, p. 69.) The oft-repeated formulation of that interpretive function first appeared in 1903: "While it is true that a surety cannot be held beyond the express terms of his contract, yet in interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts. Such construction does not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear; but it means that shall be fairly construed with a view to effect the object for which it was given, and to accomplish the purpose for which it was designed." (*Sather Banking Co. v. Briggs Co*. (1903) 138 Cal. 724, 730.)

A bedrock principle of contract law in California has always been that competent parties should have " ' "the utmost liberty of contract" ' " to arrange their affairs according to their own judgment so long as they do contravene positive law or public policy. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc*. (1992) 2 Cal.4th 342, 363 and authorities cited; see, e.g., *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 336 ["the parties are free to define their relationship . . . as they wish"];

7

*Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 75 ["Aerojet and the insurers were generally free to contract as they pleased"]; *Linnastruth v. Mut. Benefit Etc. Assn.* (1943) 22 Cal.2d 216, 218 ["parties may contract as they please so long as they do not violate the law or public policy"].)  Surety agreements are no different. (See Rest.3d Suretyship and Guaranty, § 6 & com. a, p. 29.)

The nonpaternalistic corollary to this freedom is that courts assume that each party to a contract is alert to, and able to protect, his or her own best interests.  (See *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753; *Mitau v. Roddan* (1906) 149 Cal. 1, 14.)  Therefore, courts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves.  (See *Naify v. Pacific Indemnity Co.* (1938) 11 Cal.2d 5, 11 ["Parties are, within reason, free to contract as they please, and to make bargains which place one party at a disadvantage"].)  As we stated in 1964:  "The courts cannot make better agreements for parties they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably.  It is not enough to say that . . . the contract would be improvident or unwise or would operate unjustly.  Parties have the right to make such agreements."  (*Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815; see *Moreno Mut. Irr. Co. v. Beaumont Irr. Dist.* (1949) 94 Cal.App.2d 766, 782 ["nor will the courts relieve one from the consequences of his own improvidence or poor judgment"].)  Or, as we later stated:  "It is widely recognized that the courts are not at liberty to revise an agreement under the guise of construing it.  Neither abstract justice nor the rule of liberal interpretation justifies the creation of a contract for the parties which they did not make themselves."  (*Hinckley v. Bechtel Corp.* (1974) 41 Cal.App.3d 206, 210; see Code Civ. Proc., § 1858 ["the office of the Judge is . . . not to insert what has been omitted"]; *Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486 ["The court . . . cannot insert in the contract language which one of the parties now wishes were there."].)

With these principles in mind, construction of the guaranty is not difficult.

This is not a contract of adhesion. Eves is no novice, but a knowledgeable and sophisticated person with wide experience in this particular type of commercial transaction. (See fn. 2, *ante*.) Thus, he is presumed competent to negotiate and draft documents that would protect his interests. The other instruments executed contemporaneously with the guaranty are highly pertinent to its construction.

The "Deed of Trust, Security Agreement with Assignment of Rents and Fixture Filing" that Eves, as the president of Venture Commerce Centers, signed for VPC-OR on the same day as the guaranty, has numerous references to "proceeds" in different contexts. VPC-OR transferred to Series AGI "All income, rents, royalties, revenue, issues, profits, *proceeds* and other benefits from any and all of the Land and/or Improvements," together with "All *proceeds* and claims arising on account of any damage to, or Condemnation . . . of the Land and/or Improvements." (Italics added.) VPC-OR also transferred a number of specified rights categorized as "Personal Property," which encompassed "All *proceeds* of any of the foregoing, including, without limitation, *proceeds* of any voluntary or involuntary disposition or claim respecting any of the foregoing (pursuant to judgment, condemnation award, or otherwise) and all goods, documents, general intangibles, chattel paper, and accounts, wherever located, acquired with *cash proceeds* of any of the foregoing or *proceeds* thereof." (Italics added.) Another provision explained at great length how "*Insurance Proceeds,*" "*Net Insurance Proceeds,*"[7] "*Condemnation Proceeds*" and "*Proceeds of Sale*" would be handled. (Italics added.) A glossary of "Defined Terms" stated that " 'Rents and Profits' shall mean all and any income, rents, royalties, revenue, issues, profits, *proceeds*, accounts receivable, and other benefits now or hereafter arising from the Property, or any part thereof." (Italics added.) Among the "Remedies Upon Default" given to Series AGI

---

[7] Exhibit D attached to the "Deed of Trust and Security Agreement with Assignment of Rents and Fixture Filing" addressed how "Net Insurance Proceeds" could be used for "restoration" of the property. As previously noted, "application of insurance proceeds" is also mentioned in the promissory note. (See fn. 1, *ante*.)

were a "Power of Sale" and the discretionary power over "Application Of *Proceeds* of Sale." (Italics added.)

These provisions demonstrate that the concept of proceeds was not overlooked by Series AGI, VPC-OR, or Eves. The language of the excluded assets shows that some care was given to their description. (See fn. 3, *ante*.) If Eves meant to anticipate the liquidation or sale of an excluded asset, all he had to do was insert language to cover that contingency.[8] (See *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 763 ["The policy before us . . . contains not a *criminal act* exclusion but an *illegal act* exclusion. Had Safeco wanted to exclude criminal acts from coverage, it could easily have done so."].) His failure to do so cannot be remedied with a judicial blue pencil, because we "cannot insert in the contract language which one of the parties now wishes were there." (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.*, *supra*, 184 Cal.App.3d 1479, 1486; accord, *Safeco Ins. Co. v. Robert S.*, *supra*, at p. 764.) Eves is therefore bound by the guaranty's plain language limiting the exemption from attachment to assets "expressly excluded . . . in the Asset Exclusion Schedule." Proceeds were not expressly excluded.

The arguments advanced by Eves to evade this conclusion do not persuade.

Looking to Paragraph 13 of the guaranty, this is how Eves explains its meaning: "The final sentence of Paragraph 13 refers to 'supplements or enhancements' of an excluded asset. If the excluded asset were a $3 million residence and after signing the guaranty, the guarantor 'enhanced' that asset by building a $2 million addition, the guaranty says that the value of the enhancement would not be excluded. . . . This makes sense as a hedge against the guarantor 'banking' money into an excluded asset after the loan agreement is executed that would otherwise have been available in the event of collection. In such a circumstance, the only way to give effect to the sentence is to interpret it to say that if the only way to pay the portion of value attributable to a supplement or enhancement is to sell the asset, the owner need only turn over that sum

---

[8] It is useful to note that Eves took the trouble to ensure that the exclusion of each of the two "personal residence[s]" specified that the exclusion extended to "its contents."

that represents the supplement or enhancement and may keep the balance. The only way to make sense of the exclusion being *limited to the extent of such enhancement* is to conclude that from the proceeds of the sale, the creditor receives *only* the $2 million enhancement. The limitation expressly provides that the creditor will not receive the balance of the proceeds of the sale. To argue otherwise, turns the document on its head. . . . The language of the guaranty itself clearly states that the Creditor does not receive the proceeds of sale of an excluded asset unless the asset was enhanced, and then only that portion of the proceeds of sale attributable to the enhancement." Not at all. The obvious purpose of the provision is to establish a formula for the valuation of the excluded asset and prevent that value from being "supplement[ed] or enhance[d]" in such a way that reduced Eves's other resources for satisfying his guaranty. As evident from the use of the present tense, the predicate of that purpose is Eves retaining the excluded asset. The absence of the words "sell," "sale," or "sold" from paragraph 13 is conspicuous.[9]

Eves appears to believe the exempted asset consists not of his former personal residence in Como, as such, but the market value of that residence at the time the guaranty was executed. That is not, however, what the plain language of the guaranty says. Schedule 1 declares that the excluded asset consists of "The personal residence of Robert J. Eves at Via Regina, 27 Moltrasio, Como, Italy and its contents." At the time of the attachment, Eves no longer owned the Como residence or its contents. The sale of those assets essentially vitiated the exclusion.

It is illogical for Eves to insist that "The language of the guaranty itself clearly states that the Creditor does not receive the proceeds of sale of an excluded asset unless the asset was enhanced" and that "The limitation expressly provides that the creditor will

---

[9] This absence is only underscored by the presence elsewhere *in the guaranty* of language whereby Eves waived "any and all benefits, rights and defenses under [California's Anti-Deficiency legislation] Code of Civil Procedure Sections 580a and 726, which would otherwise limit [Eves's] liability after a nonjudicial or judicial foreclosure sale".

not receive the balance of the proceeds of the sale" when the word "proceeds" is nowhere present. Nothing about proceeds from the sale of excluded assets is "clearly stated" or "expressly" provided in the guaranty. To read paragraph 13 as Eves does—to encompass proceeds from the sale of that asset—is a distortion of the natural meaning of the language chosen by the parties. (See *Sather Banking Co. v. Briggs Co.*, *supra*, 138 Cal. 724, 730.) For this court to agree with Eves would be to "revise an agreement under the guise of construing it." (*Hinckley v. Bechtel Corp.*, *supra*, 41 Cal.App.3d 206, 211.)

Similarly, with no citation to the record Eves insists that the language of Paragraph 13 was "designed to protect Mr. Eves' personal core assets . . . . Mr. Eves' business empire remained at risk and available to the lender for collection in the event of default but Mr. Eves was allowed to protect items unrelated to the business that would, if necessary, provide a life boat in the event of an economic meltdown . . . . *There is nothing in the Continuing Guaranty that supports the argument that the proceeds from the sale of an excluded asset loose* [sic] *the exclusion by virtue of the sale.* In the absence of an express agreement between the parties to the contrary, the proceeds from the sale of an excluded asset take the place of the asset itself, and the contractual rights and duties of the parties attributable to the asset apply to the proceeds." (Italics added.) This is exactly backwards—Paragraph 13 plainly conveys that Eves's guaranty could be satisfied from all of his assets except those "expressly excluded." If "personal core assets" was indeed such a pressing concern, nothing prevented Eves from using protective language.

Eves tells us that unless proceeds from the sale of an excluded asset are also excluded, "the exclusion is a term without a purpose" that will not safeguard from this scenario: "If, due to exigent circumstances, Mr. Eves had no funds and were forced to sell an excluded asset like the home in Italy in order to survive, he could be forced to pay over all of the proceeds of that sale, thereby forcing him to sell his Mill Valley home, and so on. The proceeds of that sale could be taken as well and he would have to sell one after the other, all of the 'excluded' assets enumerated in the guaranty." This is the sort of eventuality an experienced investor such as Eves, assisted by counsel, might be expected to anticipate. It is precisely the kind of situation that proves "improvident or

12

unwise or . . . operate[s] unjustly" where courts leave competent contracting parties to lie in the bed they have made. (*Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.*, *supra*, 228 Cal.App.2d 810, 815; *Moreno Mut. Irr. Co. v. Beaumont Irr. Dist.*, *supra*, 94 Cal.App.2d 766, 782.)

Eves maintains that what he is arguing for is nothing more than "the mirror image of the concept expressed" in California Uniform Commercial Code section 9315, subdivision (a)(2), which provides that a perfected security interest "attaches to any identifiable proceeds of collateral" covered by the security agreement which, Eves points out, is "created by contract between the parties." However, there is no equivalent statute for sureties, which makes it a matter for the parties' contractual negotiation. Which in turn sends us back to the absence of such a contractual provision here.

The handful of other authorities cited by Eves are equally unhelpful. *In re CellNet Data Systems, Inc.* (3d Cir. 2003) 327 F.3d 242, 248, involved a contract that did expressly address " 'proceeds from any Excluded Asset.' " The court in *In re Cunningham* (1st Cir. 2008) 513 F.3d 318, 323-324, held that the proceeds from an exempted homestead is likewise exempted. But Eves fails to appreciate that the Bankruptcy Code generally pegs such exemptions to state law (see 11 U.S.C. § 522), which is not present here. The extended discussion in *ITT Commercial Finance Corp. v. Tech Power, Inc.* (1996) 43 Cal.App.4th 1551 concerning the tracing of proceeds from the sale of collateral covered by a perfected security interest is irrelevant for the reason stated in the preceding paragraph.

Finally, Eves submits that "proceeds" should be treated as an implied term, on the theory that "after examining the contract as a whole it is so obvious that the parties had no reason to state the [term], the implication arises from the language of the agreement, and there is a legal necessity." (*College Block v. Atlantic Richfield Co.* (1988) 206 Cal.App.3d 1376, 1380.) We reject this argument because it is made for the first time in Eves's reply brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 723, p. 790.) But even if the argument were properly before us, we would reject it on the merits. Implied terms "are justified

only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed." (*Tanner v. Title Ins. & Trust Co*. (1942) 20 Cal.2d 814, 824; see (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc*., *supra*, 2 Cal.4th 342, 374 ["implied terms should never be read to vary express terms"].)  Implied terms "are disfavored at law.  The courts will not imply a better agreement for parties than they themselves have been satisfied to enter into, or rewrite contracts whenever they operate harshly." (*Vikco Ins. Services, Inc. v. Ohio Indemnity Co*. (1999) 70 Cal.App.4th 55, 70; see *Sather Banking Co. v. Briggs Co*., *supra*, 138 Cal. 724, 730 [in construing a guaranty, court will not imply "something . . . into the contract that it will not reasonably bear"].)  All of these caveats work against Eves.  The hoped-for implied term is contrary to the unequivocal language of Paragraph 13 that to be exempt from the guaranty assets must be "expressly excluded."  The guaranty appears fully capable of being effectively performed without the insertion of the term "proceeds."  And we have already pointed out that it is not our job to save Eves from himself.  (Code Civ. Proc., § 1858; *Levi Strauss & Co. v. Aetna Casualty & Surety Co.*, *supra*, 184 Cal.App.3d 1479, 1486; *Hinckley v. Bechtel Corp*., *supra*, 41 Cal.App.3d 206, 210; *Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co*., *supra*, 228 Cal.App.2d 810, 815.)

Regardless of whether the issue is framed as one of fact judged according to the standard of substantial evidence (*Schwartzman v. Wilshinsky*, *supra*, 50 Cal.App.4th 619, 626) or as one of law for our independent review (*U.S. Leasing Corp. v. DuPont*, *supra*, 69 Cal.2d 275, 284-285, 290; *Continental Casualty Co. v. Hartford Acc. & Indem. Co*., *supra*, 243 Cal.App.2d 565, 570), the result is the same:  there is no basis for relieving Eves from the consequences of the language to which he willingly assented.

### DISPOSITION

The order is affirmed.

14

 

                                        _____

                                        Richman, J.

We concur:

_____

Kline, P.J.

_____

Haerle, J.

A135832, *Series AGI West Linn of Appian Group Investors De LLC v. Eves*

Trial Court:                             Marin County Superior Court

Trial Judge:                             Honorable Roy C. Chernus

Attorney for Defendant and Appellant:    Wild, Carey & Fife, John E. Carey, Jr.

Attorneys for Plaintiff and Respondent:   Katzoff & Riggs, Kenneth S. Katzoff and
Stephen G. Preonas