Filed 4/23/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ANGEL MONDRAGON, | B328425 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22STCV25672) |
| v. | |
| SUNRUN INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael P. Linfield, Judge. Affirmed.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, Andrea K. Williams and Brandon Saxon for Defendant and Appellant.

Lebe Law, Jonathan M. Lebe, Zachary T. Gershman and Brielle D. Edborg for Plaintiff and Respondent.

# INTRODUCTION

Sunrun Inc. required its employee, Angel Mondragon, to sign an arbitration agreement, which he did. The agreement covered most disputes relating to Mondragon's employment, but it excluded claims brought "as a representative of the state of California as a private attorney general under" the Private Attorney General Act of 2004 (PAGA; Lab. Code, § 2698 et seq.). After his employment ended, Mondragon filed a complaint asserting several causes of action under PAGA. Sunrun filed a motion to compel arbitration of Mondragon's claims, which the trial court denied.

Sunrun appeals from the order denying the motion to compel arbitration, arguing that, because the parties delegated arbitrability decisions to the arbitrator, the trial court erred in ruling on whether Mondragon's claims were arbitrable. Sunrun also argues that, if the parties did not delegate arbitrability decisions to the arbitrator, the trial court erred in denying the motion because the arbitration agreement excluded only PAGA claims based on violations involving other employees, not Mondragon's "individual" PAGA claims. We conclude that, by signing an arbitration agreement that (1) merely referred to the rules of the American Arbitration Association; (2) included a carve-out that arguably covered the dispute; and (3) included a severability clause stating a court may not enforce certain provisions, Mondragon, an unsophisticated party, did not delegate arbitrability decisions to the arbitrator. We also conclude the language of the arbitration agreement did not require Mondragon to arbitrate his individual PAGA claims. Therefore, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Sunrun Hires Mondragon; The Parties Sign an Arbitration Agreement*

In January 2022 Sunrun hired Mondragon as an hourly employee, contingent on Mondragon signing a two-and-a-half-page arbitration agreement. Mondragon agreed, and he and a Sunrun representative signed the arbitration agreement. The agreement included a section describing which claims the agreement covered and a section describing which claims it did not. These are they:

**"CLAIMS COVERED BY THIS AGREEMENT**

"Except as provided below, Company and Employee (the Parties) agree to arbitrate before a neutral arbitrator any and all existing or future disputes or claims between or among them that arise out of or relate to Employee's . . . employment or separation from employment with Company. This means that the Parties agree to arbitrate any lawsuits that they may have against the other, including (but not limited to) the following:

. . . .

"claims for non-payment, incorrect or overpayment of wages . . ., failure to pay wages for all hours worked, failure to pay overtime, failure to pay wages due on termination, failure to provide accurate, itemized wage statements, failure to provide breaks, . . . entitlement to waiting time penalties and/or any other claims involving wages, hours, or conditions of work.

3

"**CLAIMS NOT COVERED BY THIS AGREEMENT**

"Parties understand and agree that the following disputes are not covered by this Agreement:

 . . . .

"claims brought by Employee in state or federal court as a representative of the state of California as a private attorney general under the PAGA (to the extent applicable) . . . ."

The agreement also included this provision governing the procedures the parties would use "for arbitration":

"**ARBITRATION PROCEDURES**

"The parties will use the American Arbitration Association ('AAA') for arbitration, subject to its Employment Arbitration Rules and mediation Procedures ('Arbitration Rules'), available at www.adr.org. . . . The Rules explain how to file a Demand for Arbitration. If the Arbitration Rules conflict with this Agreement in any way, this Agreement prevails and controls. The demand for arbitration must be filed within the statute of limitations applicable to the claim on which arbitration is sought."

Finally, the agreement included a severability clause. This is it: "The parties understand and agree that if a court or arbitrator invalidates or refuses to enforce any term or portion of this Agreement, the remainder of this Agreement shall not be

4

affected by such invalidity or unenforceability but shall remain in full force and effect . . . ."

B. *Mondragon Sues Sunrun After His Employment Ends*

A year after his employment ended, Mondragon filed this action against Sunrun, asserting a single cause of action under PAGA for Labor Code violations involving him and other employees. Mondragon alleged Sunrun failed to pay all earned wages, including overtime wages; unlawfully deducted earned wages; failed to provide required meal and rest breaks; and failed to provide accurate wage statements.

C. *Sunrun Files a Motion To Compel Arbitration; The Trial Court Denies It*

Sunrun filed a motion to compel arbitration of Mondragon's individual PAGA claims. Citing the United States Supreme Court's decision in *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639 [142 S.Ct. 1906] (*Viking River*), Sunrun contended that, where there is an arbitration agreement, a court may compel a party to arbitrate individual PAGA claims, even if the court may not compel the party to arbitrate non-individual PAGA claims. Sunrun further contended the "PAGA carve-out" provision in the arbitration agreement applied only to PAGA claims filed on behalf of other employees, not to Mondragon's individual PAGA claims.[1]

---

[1] Sunrun also asked the court, if it compelled arbitration of Mondragon's individual PAGA claims, to rule Mondragon had no standing to assert the non-individual claims and therefore dismiss or stay them. The California Supreme Court has since

5

Sunrun also contended—somewhat inconsistently—that if the court did not grant the motion to compel arbitration, an arbitrator should decide whether Mondragon agreed to arbitrate his claims.[2] Sunrun contended that the arbitration agreement incorporated the rules of the AAA and that, under the applicable rules, the arbitrator had authority to decide questions of arbitrability. Therefore, according to Sunrun, by signing the arbitration agreement, Mondragon agreed an arbitrator would decide those questions.

The trial court denied the motion to compel arbitration. The court first ruled it, not the arbitrator, should decide questions of arbitrability. Quoting *Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227 at page 239, the court ruled that, "'"unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court"'" and that the agreement's reference to the AAA rules did not clearly and unmistakably delegate arbitrability decisions to the arbitrator. The court next ruled the agreement "unambiguously" excluded PAGA claims and did not differentiate between individual PAGA claims and PAGA claims brought on behalf of other employees. The court also ruled that, even if the agreement were ambiguous regarding whether it

---

held "an order compelling arbitration" of a plaintiff's individual PAGA claims "does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA." (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1114.)

[2]     Although unclear, it appears Sunrun was asking the court to decide questions of arbitrability if (and only if) the court ruled in favor of Sunrun.

covered individual PAGA claims, the court would construe the ambiguity against Sunrun because Sunrun drafted the arbitration agreement and because Sunrun's employment offer to Mondragon characterized the arbitration agreement as "excluding Private Attorney General (PAGA) claims" (again, without differentiating between individual and other claims). Sunrun timely appealed from the order denying the motion.

## DISCUSSION

A.     *Applicable Law and Standard of Review*

Where, as here, the parties to a lawsuit have executed an arbitration agreement, a "threshold question . . . presented by every motion or petition to compel arbitration" is "whether the parties' dispute falls within the scope of that agreement." (*Ahern v. Asset Management Consultants, Inc.* (2022) 74 Cal.App.5th 675, 687; accord, *Wilson-Davis v. SSP America, Inc.* (2021) 62 Cal.App.5th 1080, 1086-1087; see *Performance Team Freight Systems, Inc. v. Aleman* (2015) 241 Cal.App.4th 1233, 1244 ["Only disputes that fall within the scope of an arbitration provision are arbitrable."].) In addition, "parties may disagree about *who*—the court or the arbitrator—has the power to decide whether the dispute is arbitrable." (*Wilson-Davis*, at p. 1087; see *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 243 (*Sandquist*) ["'the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about *that* matter'"]; *Nelson v. Dual Diagnosis Treatment Center, Inc.* (2022) 77 Cal.App.5th 643, 654 (*Nelson*) [same].) While "[b]oth the federal government and California have strong public policies '"in favor of arbitration as an expeditious and cost-effective way of resolving disputes,"

7

there "is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." (*In re Uber Technologies Wage & Hour Cases* (2023) 95 Cal.App.5th 1297, 1304-1305, internal quotation marks omitted; see *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744; *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 943.) "Indeed, a trial court has no power to order parties to arbitrate a dispute that they did not agree to arbitrate." (*Bouton v. USAA Casualty Ins. Co.* (2008) 43 Cal.4th 1190, 1202; accord, *Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 460-461; see *Howard v. Goldbloom* (2018) 30 Cal.App.5th 659, 663 ["no dispute may be ordered to arbitration unless it is within the scope of the arbitration agreement"].)

"'When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" (*Sandquist*, *supra*, 1 Cal.5th at p. 244; see *Fleming v. Oliphant Financial LLC* (2023) 88 Cal.App.5th 13, 21; *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 764.) "'An arbitration agreement is subject to the same rules of construction as any other contract.'" (*Fleming*, at p. 21; see *Mendoza*, at p. 764; *Chambers v. Crown Asset Management* (2021) 71 Cal.App.5th 583, 390.) "In determining the scope of an arbitration [agreement], '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made.'" (*Victoria v. Superior Court*, *supra*, 40 Cal.3d at p. 744; see *Ahern v. Asset Management Consultants, Inc.*, *supra*, 74 Cal.App.5th at pp. 784-785; *Howard v. Goldloom*, *supra*, 30 Cal.App.5th at p. 664.) "Where, as here,

the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC (*2012) 55 Cal.4th 223, 236; see *Barrera v. Apple American Group LLC* (2023) 95 Cal.App.5th 63, 77; *Williams v. 3620 W. 102nd Street, Inc.* (2020) 53 Cal.App.5th 1087, 1090.)[3]

B.    *The Trial Court Properly Decided Arbitrability*

Under both federal and state law, "courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about

---

[3]    Mondragon argues that, because the court considered extrinsic evidence, we should review for substantial evidence the court's ruling the arbitration agreement excluded his individual PAGA claims.  That is not the appropriate standard of review.  It is true that, "'[w]hen the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction" of a contract by the factfinder "'will be upheld if it is supported by substantial evidence.'" (*Kim v. TWA Construction, Inc.* (2022) 78 Cal.App.5th 808, 831.)  But where "'the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract.'" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531; see *Coral Farms, L.P. v. Mahony* (2021) 63 Cal.App.5th 719, 726.)  "'This is true even when . . . that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.'" (*Kim*, at p. 831; see *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 919.)  Here, the extrinsic evidence is not in conflict.  Sunrun disputes whether the arbitration agreement is ambiguous and therefore whether we may consider extrinsic evidence (see *Oakland-Alameda*, at p. 816), but the relevant documents Mondragon contends support his interpretation (which we will discuss in more detail) are not in dispute.

9

'arbitrability,'" including "'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" (*BG Group, PLC v. Republic of Argentina* (2014) 572 U.S. 25, 34 [134 S.Ct. 1198]; see *Gostev v. Skillz Platform, Inc.* (2023) 88 Cal.App.5th 1035, 1048 (*Gostev*); *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 891.) "The parties may agree to delegate authority to the arbitrator to decide arbitrability, but given the contrary presumption, evidence that the parties intended such a delegation must be "'clear and unmistakable'" before a court will enforce a delegation provision." (*Gostev*, at p. 1048; see *Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 586 U.S. ___, [139 S.Ct. 524, 530]; *Nelson, supra*, 77 Cal.App.5th at p. 654; see also *Brennan v. Opus Bank* (9th Cir. 2015) 796 F.3d 1125, 1129.) "The 'clear and unmistakable' test reflects a '*heightened* standard of proof' that reverses the typical presumption in favor of the arbitration of disputes." (*Sandoval-Ryan v. Oleander Holdings LLC* (2020) 58 Cal.App.5th 217, 223; see *Aanderud*, at p. 892.)

As stated, the arbitration agreement provided: "The parties will use the [AAA] for arbitration, subject to its Employment Rules and mediation procedures . . . available at www.adr.org." The AAA rules, in turn, contain a section titled "Jurisdiction," which states: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Therefore, according to Sunrun, the parties, by agreeing to use the AAA rules, clearly and unmistakably delegated to the arbitrator authority to decide whether the arbitration agreement covered Mondragon's PAGA claims.

As Sunrun points out, state and federal courts have held that—at least in some contexts—parties may clearly and unmistakably agree to delegate arbitrability decisions to the arbitrator by incorporating the arbitration rules of a dispute resolution provider into an agreement.  (See, e.g., *Blanton v. Domino's Pizza Franchising LLC* (6th Cir. 2020) 962 F.3d 842, 847 ["the incorporation of the AAA Rules (or similarly worded arbitral rules) provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability'"]; *Brennan v. Opus Bank*, *supra*, 796 F.3d at pp. 1128, 1130 [incorporation of the AAA rules into an employment agreement between a bank and an executive was a clear and unmistakable delegation to the arbitrator to decide whether the agreement was unconscionable]; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 557 [incorporation of the AAA Commercial Arbitration Rules was a clear and unmistakable delegation to the arbitrator to decide whether a claim was arbitrable].)  But state and federal courts have also recognized circumstances where this rule does not apply.  This case involves several of those circumstances.

First, several California courts have questioned or rejected the argument that, for unsophisticated parties like hourly employees and consumers, merely incorporating by reference the AAA arbitration rules is a clear and unmistakable agreement to delegate arbitrability decisions to the arbitrator.  *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771 (*Ajamian*), like this case, involved a dispute between an employer and employee.  The employment agreement stated the parties would resolve disputes by arbitration "according to the rules of the National Association of Securities Dealers, Inc. (or, at [the employer's] sole discretion, the [AAA] . . . .)"  (*Id.* at p. 777.)  While acknowledging how

11

"incorporation of AAA rules into an agreement might be sufficient indication of the parties' intent in other contexts," the court in *Ajamian* "seriously question[ed] how it provide[d] *clear* and *unmistakable* evidence that an employer and an employee intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court." (*Id.* at p. 790.) Ultimately, however, the *Ajamian* court declined to "decide whether an unqualified incantation of AAA rules" would "establish a clear and unmistakable delegation" and held there was no clear delegation because the agreement "did not mandate that AAA rules would *necessarily* apply . . . ." (*Id.* at pp. 790-791.)

In *Beco v. Fast Auto Loans, Inc.* (2022) 86 Cal.App.5th 292 (*Beco*) the court went a step further and held the parties to an employer-employee arbitration agreement did not clearly and unmistakably delegate to an arbitrator authority to decide whether the agreement was unconscionable. In *Beco* the employee signed an arbitration agreement that, like the one here, stated arbitration would be "administered by the [AAA]) under its National Rules for the Resolution of Employment Disputes . . . ." (*Id.* at p. 300.) Adopting the reasoning of *Ajamian*, the court in *Beco* held that, "[i]n the employment context, and especially under the facts" of the case, "incorporation by reference does not meet the clear and unmistakable test." (*Id.* at p. 305.) The court stated the agreement did not attach the AAA rules or provide the employee a means to locate them. (*Id.* at p. 306.)[4]

---

[4] The arbitration agreement here at least provided the URL of the homepage of AAA's website (although not of the applicable AAA rules) and stated Sunrun would provide a copy of the rules

12

Finally, in *Gostev, supra*, 88 Cal.App.5th 1035 the user of a mobile game platform entered into an agreement containing an arbitration provision that stated arbitration would be "'conducted by'" the AAA under its Commercial Arbitration Rules. (*Id.* at p. 1045.) The court in *Gostev* held the incorporation did not clearly and unmistakably delegate to the arbitrator authority to decide arbitrability. Quoting a federal district court case, the court in *Gostev* stated that, "'[a]lthough incorporation [of the AAA arbitration rules] by reference may fairly be deemed a clear and unmistakable delegation where there are sophisticated parties, a different result may obtain where one party is unsophisticated.'" (*Id.* at p. 1051, quoting *Eiess v. USAA Federal Savings Bank* (N.D.Cal. 2019) 404 F.Supp.3d 1240, 1253.)[5]

*Ajamian*, *Beco*, and *Gostev* are persuasive. As the United States Supreme Court explained in *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938 [115 S.Ct. 1920], the clear-and-unmistakable test recognizes that "'who (primarily) should decide arbitrability'" is a "rather arcane" question. (*Id.* at p. 945.) "A party often might not focus upon that question or upon the

---

on request. As we will discuss, however, the mere reference to the URL and the offer to provide the rules were not enough to delegate to the arbitrator authority to decide arbitrability.

[5]    In each of *Ajamian*, *Gostev*, *Nelson*, and *Beco* the applicable AAA rules contained a provision identical to the one here granting the arbitrator "the power to rule on his or her own jurisdiction . . . ." (See *Gostev, supra*, 88 Cal.App.5th at p. 1050; *Beco, supra*, 86 Cal.App.5th at p. 305; *Nelson, supra*, 77 Cal.App.5th at p. 656; *Ajamian, supra*, 203 Cal.App.4th at p. 787.)

13

significance of having arbitrators decide the scope of their own powers.  [Citation.]  And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration," courts should not "interpret silence or ambiguity on the who should decide arbitrability" point as giving the arbitrators that power' . . . ."  (*Ibid.*)

The courts in *Ajamian* and *Beco* correctly recognized there are "many reasons for stating that the arbitration will proceed by particular rules, and doing so does not indicate that the parties' motivation was to announce who would decide threshold issues of enforceability."  (*Beco*, *supra*, 86 Cal.App.5th at p. 178; see *Ajamian*, *supra*, 203 Cal.App.4th at p. 789.)  Indeed, the arbitration agreement here describes one such reason.  The provision incorporating the AAA rules is in a section titled "Arbitration Procedures" and states that those rules "explain how to file a Demand for Arbitration" and that the demand "must be filed within the statute of limitations applicable to the claim on which arbitration is sought."  The provision thus suggests the primary purpose of incorporating the AAA rules is to establish applicable procedures where a party elects to initiate arbitration proceedings—not necessarily to answer the more "arcane" question who decides questions of arbitrability.

Moreover, as the courts in *Ajamian* and *Beco* recognized, the AAA rules do not state the arbitrator "has exclusive authority" to determine arbitrability issues.  (*Beco*, *supra*, 86 Cal.App.5th at p. 306; see *Ajamian*, *supra*, 203 Cal.App.4th at p. 789.)  The rules state only that the arbitrator has "the power" to rule on the arbitrator's jurisdiction.  But courts also have that power.  (*Beco*, at pp. 305-306; *Ajamian* at p. 789.)  As in AAA international commercial arbitration proceedings, which have

14

essentially the same jurisdiction rule,[6] an "arbitral tribunal is ordinarily considered to have the authority to rule on its own jurisdiction to adjudicate a claim brought before it." (Rest.3d U.S. Law of International Commercial and Investor-State Arbitration, § 2.8, com. a.) This authority, often referred to as "competence-competence," permits an arbitrator or arbitration tribunal to "rule on all jurisdictional objections raised during the pendency of the arbitration and, if it upholds its jurisdiction, proceed with the arbitration. It is not obligated to suspend proceedings and await a judicial ruling on those objections." (*Ibid*.) But, "[a]lthough arbitral tribunals have authority to rule on challenges to their jurisdiction, it does not necessarily follow that courts are precluded from entertaining those same challenges if asked to do so prior to arbitration." (*Id.*, § 2.8, com. b.)

The AAA rule at issue here reflects the competence-competence principle. (See *Blanton v. Domino's Pizza Franchising LLC*, *supra*, 962 F.3d at p. 849 ["[t]he relevant AAA rule looks like what's known in the world of international arbitration as a 'competence-competence' clause"].) The rule permits the arbitrator to rule on jurisdictional objections, but does not remove the court's authority to (also) determine arbitrability issues—particularly after "litigation has already

---

[6]  The rule at issue here, rule 6 of the AAA's Employment Arbitration Rules and Mediation Procedures, is virtually identical to article 21 of the AAA's International Dispute Resolution Procedures.

15

commenced." (*Beco, supra*, 86 Cal.App.5th at p. 306; see *Ajamian, supra*, 203 Cal.App.4th at p. 789.)[7]

Second, even if we could say Mondragon, as an unsophisticated party, delegated to the arbitrator authority to decide some threshold issues, Mondragon did not clearly and unmistakably delegate authority to decide the specific arbitrability question at issue here—whether the arbitration agreement excluded Mondragon's individual PAGA claims. Multiple federal circuit courts have held that, even where an agreement's incorporation of arbitration rules may otherwise constitute a clear and unmistakable delegation, the rules do not apply where the arbitration agreement creates a carve-out for certain claims and the arbitrability dispute is whether the carve-out covers the claims at issue.

For example, in *NASDAQ OMX Group, Inc. v. UBS Securities, LLC* (2d Cir. 2014) 770 F.3d 1010 a service agreement between a securities exchange and a broker-dealer provided that, "[e]xcept as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and other

---

[7]     The AAA appears to have intended the rule to delegate arbitrability decisions to the arbitrator under *First Options of Chicago, Inc. v. Kaplan, supra*, 514 U.S. 938.  (See *AAA Revises Commercial Arbitration Rules* (1998) 53 Disp. Resol. J. 4, 95-96.) But it is hard to see how an unsophisticated party would understand the provision as a clear and unmistakable delegation of exclusive authority to the arbitrator to decide arbitrability issues.  And given the competence-competence meaning of the rule, even sophisticated parties with the resources to find volume 53 of the Dispute Resolution Journal might not understand the rule to delegate all arbitrability decisions to the arbitrator.

matters in question between the Parties to this Agreement . . . shall be settled by final and binding arbitration." (*Id.* at p. 1016.) The agreement further provided "any arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the [AAA] . . . ." (*Ibid.*) The court held the parties did not clearly and unmistakably delegate to the arbitrator authority to decide whether the agreement covered the broker dealer's claims against the securities exchange. (*Id.* at p. 1032.) As the court explained, a party may clearly and unmistakably delegate arbitrability decisions to the arbitrator "where a broad arbitration clause expressly commits all disputes to arbitration," but the same is not true where "a qualifying provision . . . at least arguably covers the . . . dispute." (*Id.* at p. 1031.) The court went on to hold that, because the agreement stated the AAA rules would "apply to such arbitrations as may arise under the Agreement," and because the carve-out for NASDAQ OMX Requirements at least arguably applied to the broker-dealer's claims, the carve-out "thus delay[ed] application of AAA rules until a decision [was] made" whether the claims fell "within the intended scope of arbitration . . . ." (*Id.* at p. 1032.)

Similarly, in *Archer & White Sales, Inc. v. Henry Schein, Inc.* (5th Cir. 2019) 935 F.3d 274, cert. dismissed as improvidently granted Jan. 25, 2021, an agreement between two companies provided: "Any dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property . . .), shall be resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association." (*Id.* at p. 278.) The court held that, for disputes involving injunctive relief, the parties did not delegate

arbitrability decision to the arbitrator. The court stated the "most natural reading of the arbitration clause" was that "any dispute, except actions seeking injunctive relief, shall be resolved in arbitration in accordance with the AAA rules." (*Id.* at p. 281.) Therefore, the court held, there was no "'clear and unmistakable' intent to delegate arbitrability" to the arbitrator. (*Id.* at pp. 281-282.)

The structure of the agreement here is analogous to the structure of the agreements in *NASDAQ OMX Group* and *Archer & White Sales.* The agreement here states the parties agree to arbitrate all disputes arising from Mondragon's employment, but includes a section carving out certain claims, including PAGA claims. The "Arbitration Procedures" section states the parties will use the AAA rules "for arbitration." Had the agreement stated the arbitrator would decide all disputes regarding the scope of the arbitration agreement, the analysis might be different. (Cf. *Aanderud v. Superior Court, supra,* 13 Cal.App.5th at p. 892 [provision stating the parties "agree[d] to arbitrate all disputes, claims and controversies arising out of or relating to . . . [the parties'] Agreement, including the determination of the scope or applicability of this Section . . . [the "Arbitration of Disputes" section]," was a clear and unmistakable delegation].) But by including separate sections that listed claims covered by the agreement and claims not covered by the agreement, and stating the parties would use the AAA rules "for arbitration," it was at least ambiguous whether the carve-out "delay[ed] application of AAA rules" (*NASDAQ OMX Group, Inc. v. UBS Securities, LLC, supra,* 770 F.3d at p. 1031) until a court first determined whether Mondragon's claims fell within one of the carve-out provisions.

18

Finally, the arbitration agreement here contained a severability provision indicating a court may decide at least some arbitrability issues. "'As a general matter, where one contractual provision indicates that the enforceability of an arbitration provision is to be decided by the arbitrator, but another provision indicates that [a] *court* might also find provisions in the contract unenforceable, there is no clear and unmistakable delegation of authority to the arbitrator.'" (*Jack v. Ring LLC* (2023) 91 Cal.App.5th 1186, 1197; see *Nelson*, *supra*, 77 Cal.App.5th at p. 657.) *Nelson* is a good example. There, a patient at a treatment center signed an enrollment agreement that specified "binding arbitration pursuant to the Commercial Arbitration Rules" of the AAA. (*Nelson*, at p. 656.) The agreement also contained a severability provision stating that, "[i]f *a court* finds that any provision of this Agreement is invalid or unenforceable," the remaining provisions would not be affected. (*Id.* at p. 656 & fn. 5.) The court in *Nelson* held that, "at best," the dual incorporation of the AAA rules and reference to the possibility a court may hold provisions unenforceable "created uncertainty," which precluded finding there was a clear and unmistakable delegation to the arbitrator. (*Id.* at p. 657.)

Similarly, the arbitration agreement here provides that, "if a court or arbitrator" refuses to enforce any portion of the agreement, the remainder of the agreement shall remain valid. Like the severability provision in *Nelson*, the agreement's incorporation of the AAA rules and reference to a court refusing to enforce certain provisions create an ambiguity regarding whether the parties intended to delegate arbitrability decisions to the arbitrator. Which means the parties did not clearly and unmistakably delegate to the arbitrator authority to decide

19

whether Mondragon agreed to arbitrate his individual PAGA claims.  (See also *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892-894 [where "one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator," but "another provision indicated that the court might find a provision unenforceable," the parties "did not 'clearly and unmistakably' reserve to the arbitrator the issue of whether the arbitration agreement was enforceable"].)

Sunrun argues the severability provision does not create an ambiguity whether the parties delegated arbitrability decisions to the arbitrator because a separate provision specifies which terms a court may invalidate or refuse to enforce.  Sunrun is referring to the class and collective action waiver, which requires Mondragon to arbitrate "all claims covered by this Agreement only as an individual" and waives the right "with respect to any covered claims" to participate in a class or collective action.  The section also contains a provision stating, "Any issue concerning the validity, enforceability, or scope of this class and collective action waiver must be decided by a state or federal court."  Therefore, according to Sunrun, the reference in the severability clause to a court invalidating or refusing to enforce a term of the agreement applies only to a court invalidating or refusing to enforce the class and collective actions waiver.

Sunrun's interpretation of the severability clause is arguably reasonable.  But the question is not whether the interpretation is reasonable, or even whether ""'ordinary rules of contract interpretation . . . yield the result that arbitrators have power"'" to decide whether Mondragon agreed to arbitrate his individual PAGA claims.  (*Gostev*, *supra*, 88 Cal.App.5th at

20

p. 1052; see *Ajamian*, *supra*, 203 Cal.App.4th at pp. 790-791.) The question is whether the delegation is clear and unmistakable. (*Gostev*, at p. 1052; *Ajamian*, at p. 791). And it isn't.

Mondragon was a nonexempt employee[8] whose highest education level was high school and who did not understand what an arbitration agreement was. The agreement listed certain covered claims, but carved out others, including PAGA claims. The agreement incorporated the AAA rules "for arbitration," but was otherwise silent on who would decide arbitrability issues, and contained a severability provision indicating either an arbitrator or a court could refuse to enforce a term of the agreement. To hold Mondragon clearly and unmistakably delegated to the arbitrator authority to decide whether a claim was within the PAGA carve-out would require us to presume Mondragon "locate[d] the arbitration rules at issue" (*Gostev*, *supra*, 88 Cal.App.5th at p. 1051); found "'and read . . . the relevant rules governing delegation'" (*ibid.*); understood "'the importance of a specific rule granting the arbitrator jurisdiction'" to resolve questions over the scope of the agreement (*ibid.*); understood the incorporation of the AAA rules "for arbitration" applied even to those claims carved out of the agreement; and understood the severability clause's reference to the court refusing to enforce terms applied only to the class and collective action waiver. That's a lot of presumptions for a sophisticated party, let alone for a party with no legal knowledge or counsel.

---

[8] Mondragon's job title was "Clean Energy Ambassador I." The nature of Mondragon's duties is unclear from the record, but his "Total Target Compensation" was $1,666.67 per month, plus an hourly rate of $16.50.

21

"'While such fictions might be permissible in other areas of arbitration law, that is not the case with delegation, which requires meeting a ""'heightened standard.'"'" (*Gostev*, at p. 1052; see *Beco*, *supra*, 86 Cal.App.5th at p. 306.)

Sunrun argues that, because the agreement contains a provision stating the Federal Arbitration Act (FAA) governs, we should follow (only) federal cases (i.e., federal substantive law) in deciding whether parties have delegated arbitrability decisions to the arbitrator. We should not. The California Supreme Court has held that, even where a contract "invoke[s] the coverage of the Federal Arbitration Act," when "deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*Sandquist*, *supra*, 1 Cal.5th at p. 244.) "[I]nsofar as the question who decides 'presents a disputed issue of contract interpretation,' 'state law, not federal law, normally governs such matters.'" (*Ibid.*) We follow decisions of California Supreme Court over the decisions of lower federal courts that may have taken other positions. (Cf., e.g., *Brennan v. Opus Bank*, *supra*, 796 F.3d at p. 1129 ["federal law governs the arbitrability question by default because the Agreement is covered by the FAA [citation] and the parties have not clearly and unmistakably designated that nonfederal *arbitrability* law applies"].)

More importantly, federal and California law apply the same standards in determining whether parties have agreed to arbitrate arbitrability. As stated, under both federal and state law the presumption is that parties intend courts, not arbitrators, to decide arbitrability disputes and that parties have not agreed to arbitrate arbitrability unless they "'*clearly and unmistakably*

22

provide otherwise.'" (*Nelson, supra*, 77 Cal.App.5th at p. 655; see *BG Group, PLC v. Republic of Argentina, supra*, 572 U.S. at p. 34; *First Options of Chicago, Inc. v. Kaplan, supra*, 514 U.S. at p. 939.) To the extent there is any disagreement among state and federal courts, it is not which standard applies for determining whether a party has agreed to arbitrate arbitrability, but how that standard applies in various contexts.[9]

---

[9] Some federal appellate courts have declined to adopt the sophisticated-unsophisticated party distinction discussed in *Ajamian, Beco,* and *Gostev.* (See *Blanton v. Domino's Pizza Franchising LLC, supra*, 962 F.3d at p. 851 ["nothing in the Federal Arbitration Act purports to distinguish between 'sophisticated' and 'unsophisticated' parties"]; *Arnold v. Homeaway, Inc.* (5th Cir. 2018) 890 F.3d 546, 552 [declining to adopt the sophisticated-unsophisticated party distinction where the agreement incorporates the AAA rules]; see also *Brennan v. Opus Bank, supra*, F.3d at p. 1130 ["Our holding today should not be interpreted to require that the contracting parties be sophisticated . . . before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent"]; but see *Eiess v. USAA Federal Savings Bank, supra*, 404 F.Supp.3d at p. 1252 ["In the wake of *Brennan*, there has been a split among the district courts in the Ninth Circuit as to whether the sophistication of the parties is a relevant consideration in determining whether incorporation by reference of arbitration rules amounts to a clear and unmistakable delegation."]; *Allstate Ins. Co. v. Toll Brothers, Inc.* (E.D.Pa. 2016) 171 F.Supp.3d 417, 428 [incorporation of arbitration rules "does not automatically constitute clear and unmistakable evidence that the parties intended to arbitrate threshold questions of arbitrability—at least where those parties are unsophisticated"].) In any event, "we are not bound by federal appellate decisions." (*Bennett v. Ohio National Life Assurance Corp.* (2023) 92 Cal.App.5th 723, 732.)

C.     *Mondragon Did Not Agree To Arbitrate His*
       *Individual PAGA Claims*

Having concluded the trial court properly decided the issue whether Mondragon agreed to arbitrate his individual PAGA claims, we now review the trial court's ruling he did not.  Because both federal and California law favor arbitration of disputes, where, as here, the parties have entered a binding arbitration agreement, """arbitration should be upheld unless it can be said with assurance that an arbitration [agreement] is not susceptible to an interpretation covering the asserted dispute."""  (*Salgado v. Carrows Restaurants, Inc.* (2019) 33 Cal.App.5th 356, 360; see *Ahern v. Asset Management Consultants, Inc.*, *supra*, 74 Cal.App.5th at p. 688.)  But the policy favoring arbitration """does not override ordinary principles of contract interpretation" . . . .  "[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested."""  (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 218-219; see *Ahern*, at p. 688.)

As stated, the arbitration agreement provided the following disputes were "not covered" by the Agreement: "claims brought by [Mondragon] in state or federal court as a representative of the state of California as a private attorney general under the PAGA (to the extent applicable) . . . ."  Mondragon argues this provision clearly and explicitly excluded all PAGA claims—both those for violations regarding Mondragon and those for violations regarding other employees—from the agreement to arbitrate.  Sunrun contends the provision only excluded Mondragon's PAGA claims on behalf of other employees, but not individual PAGA claims.  Mondragon's interpretation of the arbitration agreement is correct.

24

"When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party.  If it is not, the case is over." (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 464; see *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 434.)  "Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation]." (*Horath*, at p. 464; see *Brown*, at p. 433.)  Because Sunrun presented no extrinsic evidence supporting its interpretation, we need only consider the language of the arbitration agreement.

At the time the parties entered into the agreement, California courts, including the California Supreme Court, had consistently held "*every* PAGA action, whether seeking penalties for Labor Code violations as to only one aggrieved employee—the plaintiff bringing the action—or as to other employees as well, is a representative action on behalf of the state." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 387; see *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 87 ["There is no individual component to a PAGA action because "'every PAGA action . . . is a representative action on behalf of the state'""]; *Correia v. NB Baker Electric, Inc.* (2019) 32 Cal.App.5th 602, 625 ["every PAGA action seeking penalties "'*is* a representative action on behalf of the state'""]; *Perez v. U-Haul Co. of California* (2016) 3 Cal.App.5th 408, 420 ["*Iskanian* . . . held that every PAGA action, including one brought on behalf of a single employee, is a representative claim."].)  Because every PAGA action was a representative action on behalf of the state, the carve-out here for claims

brought "as a representative of the state of California as a private attorney general under the PAGA" was for all PAGA claims. (See *Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550 ["words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be"]; *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120 [same].) There is no other language in the arbitration agreement suggesting the parties intended to treat PAGA claims seeking penalties for violations regarding Mondragon (i.e., individual PAGA claims) separately from PAGA claims seeking penalties for violations regarding other employees (i.e., non-individual PAGA claims). The PAGA carve-out is not reasonably susceptible to the interpretation urged by Sunrun.

Sunrun argues the United Supreme Court's decision in *Viking River*, *supra*, 596 U.S. 639—decided after the parties entered into the arbitration agreement—mandates a different result. It does not.

Prior to *Viking River* the California Supreme Court had held in *Iskanian*, *supra*, 59 Cal.4th 348 that "an agreement by employees to waive their right to bring a PAGA action" was unenforceable as against public policy. (*Iskanian*, at p. 383.) Following *Iskanian*, some California courts had further "held that employers may not require employees to 'split' PAGA actions in a manner that puts individual and non-individual components of a PAGA claim into bifurcated proceedings." (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1118 (*Adolph*); see, e.g., *Perez v. U-Haul Co. of California*, *supra*, 3 Cal.App.5th at p. 421 ["an employer may not force an employee to split a PAGA claim into 'individual' and 'representative' components, with each being litigated in a different forum"].) In *Viking River* the United

26

States Supreme Court held the FAA did not preempt what the Court described as "*Iskanian*'s principal rule prohibit[ing] . . . parties from waiving *representative standing* to bring PAGA claims in a judicial or arbitral forum," but did "preempt[ ] the rule of *Iskanian* insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate." (*Viking River*, *supra*, 596 U.S. at pp. 649, 662; see *Adolph*, at pp. 1117-1118.) Therefore, as the California Supreme Court succinctly stated in *Adolph*, where an agreement is covered by the FAA, "*Viking River* requires enforcement of agreements to arbitrate a PAGA plaintiff's individual claims . . . ." (*Adolph*, 14 Cal.5th at p. 1119.)

But *Viking River* has nothing to say about whether there was an agreement to arbitrate Mondragon's individual PAGA claims. In *Viking River* the arbitration agreement had a broad provision requiring the employee to arbitrate all disputes arising out of her employment; it did not include a carve-out for PAGA claims like the agreement here. (See *Viking River*, *supra*, 596 U.S. at p. 647.) The agreement in *Viking River* also included a provision waiving the employee's right to bring a PAGA action—again, unlike the agreement here. (*Ibid.*) The United States Supreme Court held that, although the latter provision remained unenforceable under *Iskanian* "if construed as a wholesale waiver of PAGA claims," the employer could still compel the employee to arbitrate her individual PAGA claims under the terms of the agreement. (*Id.* at p. 662.) But nothing in *Viking River* suggests a party must arbitrate individual PAGA claims where, as here, the arbitration agreement specifically carves out PAGA claims and does not distinguish between individual and non-individual claims.

If anything, *Viking River* confirms Mondragon's interpretation that the carve-out applies to both individual and non-individual claims. In *Viking River* the United States Supreme Court characterized PAGA actions as "representative" in two senses. "In the first sense, PAGA actions are 'representative' in that they are brought by employees acting as representatives—that is, as agents or proxies—of the State." (*Viking River*, *supra*, 596 U.S. at p. 648.) In this sense, "every PAGA claim is asserted in a representative capacity." (*Ibid.*) In the second sense, the word "'representative' . . . distinguish[es] 'individual' PAGA claims, which are premised on Labor Code violations actually sustained by the plaintiff, from 'representative' (or perhaps quasi-representative) PAGA claims arising out of events involving other employees." (*Viking River*, at p. 648.) Here, the language of the PAGA carve-out more closely tracks the language describing representative claims in the first sense—claims brought "as a representative of the state of California." Therefore, under *Viking River*, the carve-out included (and the agreement to arbitrate excluded) "every PAGA claim." (*Viking River*, at p. 648.)

Sunrun asserts "the language 'to the extent applicable'" that follows the PAGA carve-out "requires the parties arbitrate Mondragon's individual claims . . . ." Sunrun provides no argument or authority for this assertion, other than to state the general proposition that courts should avoid interpretations that render part of a contract surplusage. (See, e.g., *Rice v. Downs* (2016) 248 Cal.App.4th 175, 186.) The problem for Sunrun is that the phrase "to the extent applicable" does not mean, for example, "except individual claims."

28

While courts seek to interpret contracts "'"to give effect to every part"'" and "avoid a construction 'that would render . . . provisions surplusage,'" courts do so only where "'"reasonably practicable . . . .'"'" (*Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2024) 100 Cal.App.5th 110, 124-125; see Civ. Code, § 1641; *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503.) "'The fundamental goal of contract interpretation" remains "to give effect to the mutual intention of the parties"' (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195; see *Colyear*, at p. 124), not to conjure up creative interpretations for provisions. Because we enforce the "'"outward expression of the agreement,"'" we "'are not concerned as much with what the parties might tell us they meant by the words they used as with how a reasonable person would interpret those words.'" (*Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1188; see *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758.)

A reasonable person would not interpret the words "to the extent applicable" following the PAGA carve-out as a substitute for "except individual claims" or something like that. That is not the natural meaning of the phrase. (See *Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 163 [rules of contract interpretation do "not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear"]; see also *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 39.) And the agreement does not explain what "to the extent applicable" refers to. Nor does *Viking River* or any other authority prohibit parties from

agreeing to exclude all PAGA claims, individual and non-individual, from the scope of an arbitration agreement.  (See *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 966 ["the FAA 'does not . . . prevent parties who . . . agree to arbitrate from excluding certain claims from the scope of their arbitration agreement'"].)

It may be that, had Sunrun predicted the holding in *Viking River*, Sunrun would have drafted the agreement in a way that covered Mondragon's individual PAGA claims and excluded only his non-individual PAGA claims.  But "[i]t is widely recognized that the courts are not at liberty to revise an agreement under the guise of construing it.  Neither abstract justice nor the rule of liberal interpretation justifies the creation of a contract for the parties which they did not make themselves."  (*JP-Richardson, LLC v. Pacific Oak SOR Richardson Portfolio JV, LLC* (2021) 65 Cal.App.5th 1177, 1192; see *Series AGI West Linn of Appian Group Investors DE, LLC*, *supra*, 217 Cal.App.4th at p. 163.)

Because the agreement is not susceptible to the interpretation urged by Sunrun, and because Sunrun presented no extrinsic evidence supporting its interpretation, "the case is over" (*Brown v. Goldstein*, *supra*, 34 Cal.App.5th at p. 434), and we need not consider any extrinsic evidence in interpreting the agreement.  But even if we did consider extrinsic evidence, it would confirm our conclusion the carve-out included all of Mondragon's PAGA claims, not just his individual ones. Mondragon submitted an employee guidebook Sunrun gave him. The guidebook contained a provision titled "Arbitration," which stated:  "As a condition of employment, each employee must execute an At-Will Employment, Confidential Information, Invention Assignment, and Confidentiality Agreement (the

30

'Confidentiality Agreement') prior to beginning employment with the Company.  The Confidentiality Agreement specifically provides for arbitration of all employment-related claims by the employee against the Company and waives the right to a trial by jury.  Notwithstanding the foregoing, the Confidentiality Agreement does not preclude an employee from bringing a proceeding as a private attorney general, as permitted by law . . . ."  This provision of the Employee Guidebook suggests that, by excluding PAGA claims (to the extent applicable), the arbitration agreement was most likely referring to PAGA claims Mondragon was "permitted by law" to bring.  So that the PAGA carve-out included (and the arbitration agreement excluded) all PAGA claims Mondragon was permitted by law to bring—both individual and non-individual.

## DISPOSITION

The order is affirmed.  Mondragon is to recover his costs on appeal.

SEGAL, Acting P. J.

We concur:

FEUER, J.                    MARTINEZ, J.

31